Argued at Pendleton October 28, 1920, affirmed January 4, 1921.

# WINTERMUTE v. OREGON–WASH. R. & N. CO.

### (194 Pac. 420.)

**Commerce—Federal Liability Act Exclusive as to Injuries from Handling Interstate Commerce.**

1. Federal Employers' Liability Act, as amended by Act of April 5, 1910 (U. S. Comp. Stats., §§ 8657–8665), is an exercise of the paramount authority of Congress over interstate commerce, so that such statute controls all litigation for injuries growing out of the handling of interstate commerce.

**Master and Servant — Assumption of Risk Defense Under Federal Act, Except Where Safety Appliance Act is Violated.**

2. Under federal Employers' Liability Act, Section 4 (U. S. Comp. Stats., § 8660), eliminating the defense of assumption of risk in cases of injury through violation of any safety appliance statute, the defense remains as at common law in other cases.

**Master and Servant—"Assumption of Risk" and "Contributory Negligence" Distinct Defenses.**

3. The defenses of assumption of risk and of contributory negligence are separate and distinct in legal effect, although they may rest largely on the same state of facts; assumption of risk being an implied contract condition, while contributory negligence arises from the injured employee's own tort.

**Master and Servant—Knowledge Indispensable to Assumption of Risk.**

4. Notice or knowledge and appreciation of danger are indispensable to a servant's assumption of risk of injury.

---

2. On abrogation of assumption of risk by federal Employers' Liability Act, see notes in Ann. Cas. 1915B, 481; 47 L. R. A. (N. S.) 62; L. R. A. 1915C, 69.

3. The question of distinction between assumption of risk and contributory negligence is discussed in notes in 18 Ann. Cas. 960, 21 L. R. A. (N. S.) 138.

4. On servant's knowledge as element of defense of contributory negligence, see note in 49 L. R. A. 33.

Master and Servant—Engineer, Knowing Location of Pits in Darkened Roundhouse, Held to Assume Risk.

5. Where a switch engineer going to the registry-stand in the roundhouse, darkened by steam when he entered, knew the location of engine pits, and undertook to pass between the pits obscured by the steam, instead of using a safe way, he assumed the risk of injury by stepping into one of them.

From Baker: Gustav Anderson, Judge.

In Banc.

This is an action against the defendant railway corporation, engaged in interstate commerce, to recover damages for injuries alleged to have been suffered by the plaintiff, a switching engineer in the employ of the defendant at Huntington. At the time of the accident the plaintiff was about 40 years of age, and had been in the defendant's employ some ten years in various capacities about its yards and roundhouses—as wiper, fireman, and latterly as a switch engineer. The mishap upon which the action is based occurred about 6:30 o'clock on the morning of December 31, 1916.

It is said in the complaint and admitted by the answer, in substance, that the plaintiff's first duty each day was to register at a desk in the defendant's roundhouse, for which purpose he entered that building, which was so constructed that when an engine is resting on a track therein, directly under the machine and between the tracks is a pit constructed there for the purpose of enabling mechanics to work under the locomotive in a standing position. The charge of negligence against the defendant is couched in the following language:

"The plaintiff alleges that defendant was then and there careless and negligent in the following particulars, to wit:

"(a) That said defendant failed to maintain said roundhouse, and that portion thereof which defend-

ant [plaintiff] was obliged to traverse on the way to
the register-stand in a properly illuminated condition,
and that the same was dark.

"(b) That while plaintiff was in said roundhouse
on his way to the register-stand said defendant,
through some of its careless servants, whose names
are unknown to the plaintiff, caused an engine to emit
a large quantity of steam, by reason of which said
roundhouse became so darkened it was impossible for
the plaintiff to see.

"(c) That the said defendant failed in its duty to
provide the plaintiff a safe place in which to work, in
that the said defendant did not in any manner whatso-
ever provide any safeguards around said pits to pre-
vent its employees from falling therein, or to give
warning of the proximity to the said pits, so that the
employee could protect himself when the said round-
house became so darkened that the said pits could not
be seen and distinguished."

It is further alleged in substance that by reason of
the negligent acts of the defendant, and while plaintiff
in the performance of his duty was going to the desk
to register, it became necessary for him and he sought
to go by another direction, and fell into one of the pits,
suffering injuries which he describes, all to his damage
in a sum alleged.

The defendant denies all negligence and damages
charged against it, and for a first separate defense
alleges the following matter:

"That on the thirty-first day of December, 1916,
it was engaged in the operation of a railroad in the
States of Oregon, Washington, and Idaho, as common
carrier of passengers and freight for hire; that said
railroad extended through the town of Huntington,
Baker County, Oregon, and that on said date, and for
a long time prior thereto, plaintiff was and had been a
switch engineer in the employ of the defendant at
Huntington, Oregon, and that during the period of his
said employment, he, the said plaintiff, had habitually

been in and around said roundhouse, several times each day, and knew the construction of the same and the manner in which the work and operations in said roundhouse were conducted and operated; that during all of said times the work done in said roundhouse and the operations therein required that steam be permitted to escape from engines in said roundhouse, and the emission of steam from engines in said roundhouse was a daily occurrence, as the plaintiff then and there during all of said time well knew; that the plaintiff knew of the arrangement of said roundhouse, of the locations of the pits therein, and of the fixtures, appliances, and appurtenances therein, and knew of all the conditions in and around said roundhouse; that in said roundhouse there was provided a safe way whereby to enter the same and to proceed to the registering desk in said roundhouse, and that said way was the customary and safe way to travel into said roundhouse and to said registering desk; that the plaintiff knew of the dangers incident to work in said roundhouse and of the dangers incident to the traveling or proceeding through said roundhouse and in and about the same; that the plaintiff knew of the condition of the light in said roundhouse during said times, both when steam was being emitted or had been emitted from locomotives and when it was not being emitted or had not been emitted; that the foregoing conditions referred to presented risks assumed by the plaintiff, and that whatever injury, if any, the plaintiff sustained in his fall into an engine pit in said roundhouse occurred and was the result of the risks understood, known, appreciated, and assumed by the plaintiff in his employment and work."

For a second separate defense the answer counts upon much of the same matter before described, and charges contributory negligence upon the part of the plaintiff. The reply traverses all of the new matter in the answer, and avers in substance that the way pursued by the plaintiff in going to the registry desk was the usual, customary, and habitual way that the plain-

tiff and the defendant's other employees took in going to the desk, that it was the way provided by the defendant for that purpose, and that there was no other way provided which was less dangerous, or in which the likelihood or danger of falling into the pits was less in degree than the way pursued by the plaintiff at the time of the injury. At the close of the plaintiff's case on the evidence introduced at the trial, the court granted a judgment of nonsuit on the motion of the defendant, and the plaintiff appeals.

AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. A. A. Smith.*

For respondent there was a brief with oral arguments by *Mr. A. C. Spencer* and *Messrs. Nichols & Hallock.*

BURNETT, C. J.—1, 2. Without dispute this action is brought under the federal Employers' Liability Act of April 22, 1908 (Chapter 149, 35 U. S. Stat. 65). This act was amended April 5, 1910 (Chapter 143, 36 U. S. Stat. 291; U. S. Comp. Stats., §§ 8657–8665), but not in a way affecting the present issue. By Section 3 of that statute, contributory negligence of the employee who brings action against his employer serves only to mitigate the damages in proportion to the amount of negligence attributable to the employee. Section 4 reads thus:

"That in any action brought against any common carrier under or by virtue of any of the provisions of this act to recover damages for injuries to, or the death of any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where the violation by such common car-

rier of any statute enacted for the safety of employees, contributed to the injury or death of such employee.''

As Congress legislated in this matter in the exercise of its paramount authority over interstate commerce, the laws thus promulgated constitute the exclusive standard by which litigation for injuries growing out of the handling of interstate commerce must be adjudicated: *Second Employer's Liability Cases,* 223 U. S. 1, 55 (56 L. Ed. 327, 38 L. R. A. (N. S.) 44, 32 Sup. Ct. Rep. 169); *Seaboard Airline Ry.* v. *Horton,* 233 U. S. 492 (58 L. Ed. 1062, Ann. Cas. 1915B, 475, L. R. A. 1915C, 1, 34 Sup. Ct. Rep. 635); *Oberlin* v. *Oregon-Wash. R. & N. Co.,* 71 Or. 177 (142 Pac. 554). The principle is also laid down in *Seaboard Airline Ry.* v. *Horton,* 223 U. S. 492 (58 L. Ed. 1062, Ann. Cas. 1915B, 475, L. R. A. 1915C, 1, 34 Sup. Ct. 635, see, also, Rose's U. S. Notes), that since the federal Employers' Liability Act has expressly eliminated the assumption of risk in certain specified cases, the intent of Congress is plain that in all other cases, such assumption shall have its former effect as a bar to action by the injured employee. It will be noted that the only limitation the statute in question places upon the defense of assumption of risk is that the injury shall not have been caused or affected by a violation of any statute enacted for the safety of employees. It is not pretended in the instant case that there was any violation of any safety statute involved. This situation leaves the defense of assumption of risk as it was at common law, for the purposes of this case.

3. Another proposition well established by the precedents is that the defenses of assumption of risk and of contributory negligence are separate and distinct in legal effect, although as applied in practice they may largely rest upon the same state of facts. The

rule is thus stated in a note in 49 L. R. A. 33, 50, reporting the case of *Limberg* v. *Glenwood Lumber Co.,* 127 Cal. 598 (60 Pac. 176, 49 L. R. A. 33), reading as follows:

"The doctrine of assumed risks obtains without necessary reference to the existence of negligence. If the servant, with knowledge of a defect in the master's premises, and of a danger and risk incident thereto, continues in the service of the master without proper notice to the latter, he assumes the risk incident to the service and growing out of the existence of the defect, and this without regard to the degree of care which he may exercise in the performance of his labors: *Texas & N. O. R. Co.* v. *Conroy* (1892), 83 Tex. 214 (18 S. W. 609); *Texas & P. R. Co.* v. *Bryant* (1894), 8 Tex. Civ. App. 134 (27 S. W. 825).   See, also, *Probert* v. *Phipps* (1889), 149 Mass. 258 (21 N. E. 370); *Tuttle* v. *Detroit, G. H. & M. R. Co.* (1887), 122 U. S. 189 (30 L. Ed. 1114, 7 Sup. Ct. Rep. 1116, see, also, Rose's U. S. Notes); *Southern P. Co.* v. *Seley* (1894), 152 U. S. 145 (38 L. Ed. 391, 14 Sup. Ct. Rep. 530); *Sneda* v. *Libera* (1896), 65 Minn. 337 (68 N. W. 36); *Anderson* v. *C. N. Nelson Lumber Co.* (1896), 67 Minn. 79 (69 N. W. 630); *Wuotilla* v. *Duluth Lumber Co.* (1887), 37 Minn. 153 (33 N. W. 551); *St. Louis, Ft. S. & W. R. Co.* v. *Irwin* (1887), 37 Kan. 701 (16 Pac. 146); *Pennsylvania Co.* v. *Witte* (1896), 15 Ind. App. 583 (43 N. E. 320)."

The annotations on this subject are continued in the case of *Rase* v. *Minneapolis etc. Ry. Co.,* 107 Minn. 260 (120 N. W. 360, 21 L. R. A. (N. S.) 138).   The principle established by such cases is that assumption of risk is an implied condition of the contract between the employer and the employee, while negligence of the employee contributing to his hurt arises from his own tort; or, as expressed in *Davis Coal Co.* v. *Polland,* 158 Ind. 607 (62 N. E. 492, 92 Am. St. Rep. 319):

"Assumption of risk is a matter of contract, express or implied, while contributory negligence is a matter of conduct."

The rule is thus stated in *Ball* v. *Gussenhoven,* 21 Mont. 321 (74 Pac. 871):

"If the defense of assumption of risk is maintained, the question of the existence of contributory negligence does not arise, because, if plaintiff assumed the risks of the employment, he cannot recover, even if he exercised the highest degree of care."

In argument, the effort of the plaintiff seems to be to array the case of *Oberlin* v. *Oregon-Wash. R. & N. Co.,* 71 Or. 177 (142 Pac. 554), against the proposition that the defenses of contributory negligence and assumed risk are distinct. On that question the opinion there turned upon a matter of pleading, and assumption of risk was laid out of the case because not properly averred. The defense there was predicated on allegations of rules covering the activities of employees and certain specified violations of those regulations upon the part of the plaintiff. It was there said:

"Where parties are free to contract as to the conditions and regulations under which they will prosecute an undertaking, disregard or disobedience of rules is referable to negligence, and is not properly classified under assumption of risk."

"Disregard or disobedience of rules" implies negation which *ex vi termini* characterizes negligence. On the other hand, assumption of risk suggests affirmative action or volition by which the actor evinces knowledge and adoption of the conditions and circumstances under which he performs the act in question. The defense in the Oberlin case was based solely upon infraction of the defendant's rules. It was nowhere

stated in the answer there that the plaintiff was required to go between the cars to couple them, or that he knew the risk attendant or appreciated it and so assumed the hazard of the employment. As to the defense of assumption of risk, the Oberlin case is not in point in the present juncture.

4. Lastly, it is sound doctrine that notice or knowledge and appreciation of the danger are indispensable to the assumption of risk: *Winona* v. *Botzet,* 169 Fed. 321 (94 C. C. A. 563, 23 L. R. A. (N. S.) 204).

5. With these principles in mind, the testimony given by the plaintiff and his single witness as to the circumstances of the accident is here set down in substance in narrative form. The plaintiff testified practically as follows:

"The only thing calling a switch engineer into the roundhouse was the matter of registering. The desk prepared for that purpose had been in the roundhouse about a month before the accident. The building was a 12-pit roundhouse, the pits being about four feet deep where the engines entered from the east. The floor in the house outside of the pits and between them consisted of tarred wooden blocks, black in color. There were four lights between the pits. I went into the roundhouse through the small door in the southeast corner. I usually entered there. That was the customary way to enter. There was a door near the desk, but it was never used to my knowledge. I followed the east wall to near the center where the desk was opposite. That was my usual way of going, and the way pursued by other employees. It was more direct. One trip I made the other way, going along the south side between the wall and pit 12, and thence on the west side in front of the pits to the desk, I stumbled over a bucket that somebody left along the south wall. There were tool-racks and closets there and sometimes tools lying there. The closets didn't give you so much room. The morning I was hurt I went along the east

wall. When I got near the center I turned to go towards the desk. I hadn't particularly noticed the steam. There was steam, but when I started towards the desk everything appeared all right. The light appeared all right. I thought I was right opposite the desk but the steam there confused me, and I stepped into one of those pits. The steam was extraordinary, more than I had ever contended with before. I had no difficulty before in distinguishing the pits. This morning it was foggy. The pits all looked like the floor. From where I walked I thought I was between the pits. It looked just the same as the floor, and I stepped into one of the pits. It was black just like the floor. I had been in the roundhouse a great many times before and knew the pits were there. I know the building was not well lighted. The night before it was dark when we went out. It wasn't well lighted when we went out. There were no rails or anything around the pits to keep employees from falling in."

On cross-examination, he testified substantially that there was plenty of room to walk between those pits and the side of the roundhouse, and that:

"I had carefully studied the location of them in respect to the rear of the roundhouse, and had been around the other way before, without going in the rear of the engines. In going around between pit 12 and the south wall of the house and thence across to the desk it was impossible to cross over the pits. Apparently it was not very dark at first. At best, I could find my way without difficulty. There were lights there, but I could not be positive of their exact location. I don't remember stopping in going from the entrance to the place where I fell into pit 6. I could see pit 12 right in front of the door as I came in. There is about the same space west of the pits as east of them. I never came in contact with any tools on the east side, though I have seen them lying on the floor in front of the locomotives on the west side."

H. J. McIntire was a boilermaker's helper, employed in the roundhouse, and was gathering up his tools preparatory to leaving the night shift when the accident occurred. He said that he and another employee "blew off" an engine between 4 and 6 o'clock of the morning of the accident; also:

"I began gathering up tools at 6:30 o'clock. I had a bunch of tools, going to the tool-rack, and came against Mr. Hopper, helping Mr. Wintermute out of the pits. The steam would make it dark in the roundhouse. There was a great amount at that end, not any more than ordinarily comes from blowing off an engine, but more than ordinary if you hadn't blown off one. There is more or less steam in the house all of the time. There were forty-eight lights provided for, four between each pit, one at each end and two in the center. There were nine lights burning, that morning. The rest would not burn. At 6:35 A. M. there were burning: one light in front and one in rear between the wall and pit 1; one light in front and one in rear between pits 2 and 3; one light in front and one in rear between pits 4 and 5; one light in front and one in rear between pits 5 and 6; and one light in rear between pits 8 and 9. It was very dark in the north portion of the building because of dense steam and I can't say as it was poor lights, because they had lights in the north end. There were more lights in the north end than in the south end. I don't know if the trainmen had any particular route, that is, coming from the train they get off the engine, they would come in the big doors if they were open, the ones they run the locomotives in and out. The O.-W. men usually come in by the northeast and southeast doors. The general run of them would come on the east side and right up to the desk between the pits. That is the way Mr. Wintermute testified he went."

On cross-examination he said:

"The engine was blown off prior to 6:30 on either stall 2 or 3, which would be in the north end. I would

say it was between 4 and 6 o'clock that we blew that engine off. It might have been 4 and it might have been 6 o'clock.''

From the plats admitted in evidence it appears that the roundhouse is built to conform to segments of concentric circles, the smaller circle being the east side and entrance for engines, which are run in over the pits and headed towards the circumference of the larger circle. There are 12 pits, numbering from the north to the south side of the house. Besides the large doors which were closed by steel curtains sliding up and down, there was a small door near each corner of the building. The desk towards which plaintiff was going is located on the west side, next to the wall between pits 4 and 5. The lockers and tool-rack are situated in front of pits 7 to 11. The floor space in front of the pits on the west side was about 14 feet in width, and substantially the same on the east side in the rear of the engines. After he entered the small door near the southeast corner, pit 12 was immediately in front of the plaintiff. By turning to the left and going along the south wall between it and pit 12, he could have gone to the desk without crossing any pit, as stated in his evidence. Instead of doing so, he turned to the right, passed along the east wall until he came, as he thought, about opposite the desk, the location of which he distinguished by the light suspended over it, and turning in that direction, fell into pit 6. He admits having traversed before the course around by the south side and thence across in front or west of the pits, but claims that on one occasion in going that way he stumbled over a bucket, and that he had seen tools lying along in the space in front of the locomotives. He does not state or pretend, however, that any such obstacles were there at the time of

the accident.   It is plain from his own testimony that
he had the choice of going either way.

Recurring now to his charges of negligence, we find
the first is that the defendant failed to maintain said
roundhouse and that portion thereof which defendant
was obliged to traverse on the way to the registry-stand
in a properly illuminated condition, and that the same
was dark.   The evidence does not sustain this allega-
tion, for the plaintiff was not obliged to travel the way
he did.   Nothing prevented him from entering either
of the small doors and going around the pits instead
of attempting to pass between them.   As to the dark-
ness, he said, "it was apparently not very dark at
first," that he could find his way without difficulty, and
that he could see pit 12 right in front of the door as he
came in.

The second charge of negligence is that while he was
in the roundhouse on the way to register, the defend-
ant, through some of its careless servants, caused an
engine to emit a large  cloud of steam, by reason of
which the building became so darkened it was impos-
sible for him to see.   On this subject, his own witness
testifies that the steam was blown off from the engine
between 4 and 6 o'clock of that morning, at least, con-
sidered the most favorably for the plaintiff, a half
hour before he entered the building.   He himself does
not testify that the steam was blown off after he
entered the roundhouse.

It is said in the third place that the defendant was
remiss in its duty, and did not provide a safe place
for the plaintiff to work, by not erecting guards
around the pits.   But the fact is, as stated by the
plaintiff himself, that there was a safe place for him
to walk in going to the desk.   His own testimony was
that there was a door in the northwest corner near

the desk, through which he could have entered, and that he could have gone around the pits by the south side and thence across on the west side, without crossing the pits. From the testimony in his behalf, we are driven to the conclusion that he certainly knew of the existence and situation of the pits. The evidence shows that the steam had been discharged at least half an hour before he entered the building. There was no evidence that any steam was discharged after he went in. All the steam there and its situation with reference to the pits was plainly visible before his eyes, and there was no change in that respect from the time of his entry until his fall. Plainly without being compelled to do so, but of his own free choice, he undertook to make his way through a cloud of steam between the pits. We thus have established all of the elements of knowledge and appreciation of danger, which are the ingredients of assumption of risk.

Discussing this subject in *Seaboard Air Line Ry.* v. *Horton*, 233 U. S. 492 (58 L. Ed. 1062, Ann. Cas. 1915B, 475, L. R. A. 1915C, 1, 34 Sup. Ct. Rep. 635), Mr. Justice Pitney, speaking for the Supreme Court of the United States, said:

"Some employments are necessarily fraught with danger to the workman—danger that must be and is confronted in the line of his duty. Such dangers as are normally and necessarily incident to the occupation are presumably taken into the account in fixing the rate of wages. And a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not. But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work. These the employee is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it,

unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them. These distinctions have been recognized and applied in numerous decisions of this court: *Choctaw, O. & G. R. Co.* v. *McDade,* 191 U. S. 64, 68 (48 L. Ed. 96, 24 Sup. Ct. Rep. 24); *Schlemmer* v. *Buffalo, R. & P. Ry. Co.,* 220 U. S. 590, 596 (55 L. Ed. 596, 31 Sup. Ct. Rep. 561); *Tex & Pac. Ry. Co.* v. *Harvey,* 228 U. S. 319, 321 (57 L. Ed. 852, 33 Sup. Ct. Rep. 518); *Gila Valley Ry. Co.* v. *Hall,* 232 U. S. 94, 102 (58 L. Ed. 521, 34 Sup. Ct. Rep. 229, see, also, Rose's U. S. Notes), and cases cited.

"When the employee does know of the defect, and appreciates the risk that is attributable to it, then if he continues in the employment, without objection, or without obtaining from the employer or his representative an assurance that the defect will be remedied, the employee assumes the risk, even though it arise out of the master's breach of duty. If, however, there be a promise of reparation, then during such time as may be reasonably required for its performance, or until the particular time specified for its performance, the employee relying upon the promise does not assume the risk, unless at least the danger be so imminent that no ordinarily prudent man under the circumstances would rely upon such promise."

In *Brundage* v. *Southern Pacific Co.,* 89 Or. 483 (174 Pac. 1139), Mr. JUSTICE JOHNS, writing the opinion, reviews the precedents at length, and the result of his investigation is thus summed up on this point by the following excerpt from the syllabus:

"Where a railroad telegraph inspector, having for more than thirty days used a speeder, and knowing that a tunnel was without lights, and that construction trains backed through such tunnel without lights, was killed while in the tunnel through collision with a construction train, the railroad is not liable; the inspector having assumed the risk."

In his concurring opinion in the Brundage case, Mr. Justice Harris uses this language:

"The decedent assumed both the risk of the work train running without a schedule and also the risk of the tunnel itself being unlighted. Framhein assumed all the risks that were ordinarily incident to his employment, and also extraordinary risks which he knew, or ought to have known, and appreciated" citing *Galvin* v. *Brown & McCabe,* 53 Or. 598, 611 (101 Pac. 671).

Practically without exception the cases cited by the plaintiff show that the injured plaintiff was not informed of the danger by which he received his hurt. For instance, *Acres* v. *Frederick & Nelson,* 79 Wash. 402 (140 Pac. 370), was a case where the plaintiff had been hired only the day before for work in the defendant's warehouse. There were several passageways between piles of furniture stored there. An elevator was located near the center of the main floor. Ordinarily, when the elevator was either above or below that floor there were gates which prevented anyone from falling into the shaft. On this occasion the gates had been tied up, so that they presented no obstacle to anyone going there. The plaintiff had no knowledge of this condition, and approached the elevator shaft through one of the passageways, which was not well lighted, and on account of his ignorance of the raising of the gates, and that the elevator itself was away from that floor, he fell into the shaft, but he was held not to have assumed the risk of his employment, because he was not aware of the danger. *Pesin* v. *Jugovich,* 85 N. J. Law, 256 (88 Atl. 1101), is not in point, because the assumption of risk was expressly eliminated from that case, and it was decided solely on the question of contributory negligence. In *Faxen* v. *Butler,* 206 Mass. 500 (92 N. E. 707, 138 Am. St. Rep.

405, 19 Ann. Cas. 660), the plaintiff had rented a room opening upon a lighted hall in which there was a flight of steps, upon which her door opened. It was there held that she assumed the risk of using the hall thus lighted, but not the risk of its use when not lighted, when she had no knowledge that it was dark before entering it. Her door gave immediately upon the flight of steps, and, without knowledge that the light had been extinguished she stepped out and missed her footing on the stair. In *Dixon* v. *Swift*, 238 Ill. 62 (87 N. E. 59), it was held that, if the plaintiff's decedent had no knowledge of the removal of boards across the top of some bins where he was installing a line shaft, he did not assume the risk of going there. In *Letchworth* v. *Boston & Me. Ry.*, 220 Mass. 560 (108 N. E. 500), the plaintiff was ignorant of the removal of a foot-bridge over which all officers and employees of the defendant habitually passed, and hence was held not to have assumed the risk of passing that way. Besides this, assumption of risk in that case was not set up as a defense. In *Gregoric* v. *Percy-La Salle M. & P. Co.*, 52 Colo. 495 (122 Pac. 785, Ann. Cas. 1913E, 1030), the decedent did not know of the location or existence of the mine chute down which he fell, and the court said:

"He only assumed the risk of dangers which he knew existed, or which, by the exercise of reasonable care, he could have ascertained."

In argument in his brief in the instant case the plaintiff's counsel says:

"It is not a case of the plaintiff going into a darkened building with knowledge of pitfalls and taking chances of being able to negotiate his mission with safety, but he had come into a building which when he entered was absolutely safe and remained so until the steam from the engine enveloped him and created a

condition in which he was unable to determine the location of the pits and avoid them.''

A close analysis of the testimony does not sustain the conception of the environment thus quoted. The plaintiff was thoroughly familiar with the situation. He himself says that he had carefully studied the location of the pits with respect to the rear of the roundhouse. The evidence plainly shows that the steam had been blown off before he went into the building; and, granting that it darkened the interior, it is indeed a case of the plaintiff's going into a darkened building with knowledge of pitfalls and taking chances of being able to negotiate his mission with safety. Having a thorough knowledge of the situation, and volition to go where he chose, he must be held to have assumed the risk of going the way he did.

The judgment of the Circuit Court is affirmed.

AFFIRMED.