Argued September 8; affirmed October 4, 1938

# WHISLER *v.* UNITED STATES NATIONAL BANK OF PORTLAND ET AL.

(82 P. (2d) 1079)

*Frank S. Senn,* of Portland (Senn & Recken, of Portland, on the brief), for appellant United States National Bank.

*James C. Dezendorf,* of Portland (Dey, Hampson & Nelson and W. H. Maguire, all of Portland, on the brief), for appellant Ex-Cel Pharmacy.

*Floyd D. Moore* and *George Neuner,* both of Portland (Floyd D. Moore and Neuner & Kimmell, all of Portland, on the brief), for respondent.

BELT, J. Plaintiff in this action seeks to recover damages for personal injuries sustained in falling through a trap door in the floor of a building occupied by the defendant Ex-Cel Pharmacy under a lease from the defendant United States National Bank. Plaintiff obtained a verdict and judgment against both defendants in the sum of $3,874.64.

The defendants, by separate motions for a judgment of involuntary nonsuit and a directed verdict, have presented for review the sole question as to whether the court erred in submitting the case to the jury.

The defendant bank denies any negligence on its part as it had no control or supervision over the use of the trap door at the time plaintiff was injured and alleges affirmatively the defense of contributory negligence and assumption of risk. The defendant Ex-Cel Pharmacy contends that plaintiff, as a matter of law, is precluded from recovery by reason of her contributory negligence and alleges that any danger involved in the use of the trap door was assumed by plaintiff as incident to her employment.

■ In view of the assignments of error, the statement of facts will be considered in the light most favorable to plaintiff. The court will not be concerned with questions of fact involving a conflict of evidence.

For the purpose of operating a drug store, Ex-Cel Pharmacy leased from month to month from the United States National Bank a certain part of the lower floor

of a building in the city of Portland. Plaintiff was employed at the soda fountain and lunch counter operated in connection with the drug store. Her hours of work were from 5 o'clock in the afternoon until midnight. At the time of the accident in question, on May 30, 1936, she went into the drug store at about 4:30 in the afternoon to get an apron to take to the laundry. This apron was in an enclosure at the rear of the drug store wherein the trap door was located. When plaintiff reached for her apron she fell through this trap door, sustaining severe and permanent injuries.

The evidence tends to show that the light was very poor in the enclosure and a person could enter only through a small gate flush with the trap door which, when closed, constituted the greater part of the floor. Steep, narrow stairs led from the trap door to the floor of the basement about eight feet beneath. Above the gate and on the wall of the enclosure were hooks upon which the plaintiff, with knowledge and permission of the defendant Ex-Cel Pharmacy, hung her working apron and coat. There was a small "25 or 40 watt" light in the basement which, according to some witnesses, reflected on the stairs and trap door opening, but plaintiff testified that the electric light in the basement was not burning. All witnesses agree that the electric light over the prescription counter in the rear of the store and opposite the enclosure in question was not turned on. Some witnesses testified that had such light been burning it would have reflected no light on the trap door. A few minutes prior to the accident a druggist in the employ of the defendant Ex-Cel Pharmacy had opened the trap door to accommodate an elderly friend who wanted to go down the stairs into the basement for the purpose of using a toilet. After his friend returned from the basement the attention of

the druggist was apparently diverted by customers in the store and it is quite reasonable to assume that he forgot to close the trap door.

The plaintiff had been in the employ of the defendant Ex-Cel Pharmacy for about four months before the accident happened and was familiar with the operation and use of the trap door and the stairs leading therefrom to the basement. She testified, however, that at the time in question she looked to see whether the trap door was closed but, on account of the dim light, was unable to see plainly. She said the trap door was usually closed and that the gate in front of the same was generally fastened by a hook, although it was not fastened at the time of her accident. Plaintiff thus describes how the accident occurred:

"Well, I walked into the store to the back end of the store, and I nodded to Mrs. Snedeger, and I spoke to Mr. Bradshaw, he was at the back of the case by the entrance as you go into the room, and I looked into the room and didn't see any light, and it didn't look to me like the trapdoor was open, and I seen my apron there and stepped in and reached for it, and that is all I remember."

On cross-examination, in response to the question, "You testified a few minutes ago that you come in and you saw your apron and opened the door and reached for your apron," the plaintiff answered:

"I looked and I didn't see no light and the trapdoor didn't look open to me and it was dark, and I saw my apron hanging there, and I reached for it."

■■ We see no basis for liability against the defendant bank. It had no control over the manner in which the trap door was used. Certainly it is not the law that a landlord, in order to avoid liability for negligence of his tenant, must follow him around to see that a trap

door not in use is closed. There is no evidence to indicate any structural defect in the trap door nor was there any covenant in reference to repairs. As a matter of fact, there were no repairs to make. We cannot agree with respondent that the manner in which the trap door was constructed and maintained constituted a nuisance. Trap doors in buildings occupied for business purposes are not unusual. Ordinarily, there is nothing inherently dangerous about a trap door. It becomes dangerous only by reason of its use.

*Lewis v. Jake's Famous Crawfish,* 148 Or. 340 (36 P. (2d) 352), in which numerous authorities are cited, is decisive of the case at bar so far as the defendant bank is concerned. In that case the plaintiff was injured by falling through a trap door in a sidewalk. On appeal it was held that the defendant owner of the building was entitled to a directed verdict. The court said:

"It is common knowledge that sidewalk doors, similar to those involved in this action, are in general use in the city of Portland, and it must be presumed, so far as this case is concerned, that their maintenance and use do not constitute per se a nuisance. There was nothing inherently dangerous in the construction of these doors, or in their use. The accident occurred not through the fault of the owner of the premises but from the negligence of the lessee in permitting the doors to remain open when not in use and at a time when the public was entitled to the entire width of the sidewalk."

Also see: *Torpey v. Sanders,* 248 App. Div. 303 (289 N. Y. S. 532); Tiffany on Landlord and Tenant, 681, and cases cited in note 70 A. L. R. 1370.

 A much closer question is presented as to whether plaintiff, as a matter of law, was guilty of contributory negligence. In considering the evidence the court must measure the conduct of the plaintiff by the

standard of care that an ordinarily prudent person would have exercised under the same circumstances. Too often courts, in the quietude of the office and in the light of subsequent events, are inclined to say that an accident could have been avoided had the person injured done this or that thing. Such, however, is not the test. Plaintiff, in the instant case, undoubtedly assumed that the trap door was closed. Whether, under such circumstances, she ought, in the exercise of reasonable care, to have turned on the basement light to see if the trap door was open was a matter for the determination of the jury. She had the right, in the absence of knowledge to the contrary, to assume that the trap door would be closed when not in use. She was not obliged to anticipate that a death trap would be created.

■■ In our opinion, different reasonable deductions from the evidence might well be made by fair-minded persons as to whether plaintiff exercised due care to avoid injury. As stated in *Grand Trunk Ry. Co. v. Ives,* 144 U. S. 408, 417 (12 S. Ct. 679, 36 L. Ed. 485), and quoted with approval by this court in *Rice v. City of Portland,* 141 Or. 205 (7 P. (2d) 989, 17 P. (2d) 562) :

"When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them, that the question of negligence is ever considered as one of law for the court."

The trial court did not err in submitting the issue of contributory negligence to the jury. We see no need of reviewing authorities on such question. The law in reference thereto is well settled. It is in the application of the law to a particular factual situation that diffi-

culty often times arises and, of course, the decision in each case hinges upon the particular facts involved.

■■ We think plaintiff at the time of the accident had the status of an invitee rather than that of an employee: *Putnam v. Pacific Monthly Co.*, 68 Or. 36 (130 P. 986, 136 P. 835, 45 L. R. A. (N. S.) 338, L. R. A. 1915F, 782, Ann. Cas. 1915 C, 256). Surely she was not a trespasser. She did not enter the drug store to begin work. Her time was her own and she could do what she pleased until 5 o'clock. Cases wherein a person was injured on the way to or from work on the premises of his employer are not in point: *Wintermute v. O. W. R. & N. Co.*, 98 Or. 431 (194 P. 420). If plaintiff was an invitee the defense of assumption of risk is not involved.

The judgment as to the defendant United States National Bank is reversed and that against the defendant Ex-Cel Pharmacy is affirmed.

BAILEY, J., did not participate in the decision of this case.

———

ROSSMAN, J. (dissenting in part). I concur in that part of the opinion written by Mr. Justice BELT which reverses the judgment entered in the circuit court against the appellant, The United States National Bank of Portland, but dissent from that part which affirms the judgment as to Ex-Cel Pharmacy. To the latter corporation reference will hereafter be made as the defendant.

The area involved in this action was a space about three by nine feet in size in its floor dimensions. It formed a part of the rear portion of the defendant's drug store. One of its two nine-foot sides, that is, the one to the right, was the inside of the exterior wall of the building. The opposite wall consisted of the rear of some showcases which rose almost to the ceiling. One

of the three-foot sides, which we may consider as the back of the room, was a solid wall. It, like the exterior wall to the right, admitted no light into the room. The other three-foot side was entirely open except for a gate, three feet, four inches high, the bottom of which was flush with the floor. The gate was the full width of the opening—three feet. Its hinges were on its right-hand side and it swung outward, that is, toward one entering. A section of the floor three by six feet in area, being the part nearest the gate, consisted of a door—the parties call it a trap door. Beyond the door was a regular floor. Upon the right-hand side of this door were two hinges by which it could be opened along its long side. When open it rested on one of its six foot edges and reclined against the wall to the right. In this position it permitted passage to a staircase which led to the basement. The staircase, like the door and gate, was three feet wide. The uppermost step of the stairs was immediately beyond the gate. Thus, when the trap door was down the space formed a room three by nine feet in size; but when the door was up, it assumed the form of a stair hall leading to the basement. The basement, besides containing a toilet and dressing room, was also used for storage purposes. The store's employees hung their hats, coats and aprons on hooks which were on the right-hand wall of this room. The aforementioned gate was equipped with a spring which kept it closed. There was no electric light in this room; nevertheless, sufficient light entered so that any garment hanging upon the wall could readily be seen. One of the plaintiff's witnesses testified that the room was not pitch-dark, and described it as "dim." The plaintiff gave the following testimony:

"Q. As a matter of fact, there was light that came in there into this little room so that you could see in

there without any light being turned on if you really looked, is that not a fact? A. Yes, sir.

"Q. So that whether there was light on or off, if you really looked you could see back into this little room, couldn't you? A. Yes, sir."

She added that upon the occasion in question she had no difficulty whatever in seeing her "colored" apron which hung on the right-hand wall a little beyond the gate.

There was an electric light in the basement which was turned on by a switch located near the left upper corner of the gate. One who desired to open the gate and enter would take hold of the gate's left-hand side and swing it towards him, stepping back so as to permit the gate to swing open. Three or four inches from the place where he would take hold, the switch was located. When the light was turned on, the basement was illuminated and light was reflected against the basement stairs and landing. If the trap door was open anyone peering over the gate could see the steps, the landing and part of the basement. Thus, the light would warn him that the door was open. But if he saw no light after he had flipped the switch he would know that the trap door was closed and that he could safely walk ahead. As authority for these statements, the following is quoted from the testimony of one of the plaintiff's witnesses:

"A. If the light was on in the basement you could see a reflection of the light on the landing. * * * Yes, you could see that the trap door was open if the light was on in the basement."

Another of the plaintiff's witnesses testified:

"A. When the trap door was open and the light was on in the basement, naturally, you could see there was a light on in the basement.

"Q. You could see down in the basement? A. Yes, you could see down in the basement.

"Q. If you turned the light on before you opened the gate and the trap door was open, you by standing there before you opened the gate could see that the trap door was open, couldn't you? A. Oh, yes, you could do that all right, you could tell that the basement was down there and that there was a light in the basement."

When the plaintiff was asked whether she could have seen whether the trap door was open or closed had she turned on the basement light, she replied: "If I had done so, yes, sir, I could have seen."

Three feet from the gate and opposite to it was a door leading into the prescription room, nine by nine feet in size. The latter was equipped with an electric light of 100 watts, operated by a switch immediately at the back of the plaintiff as she opened the gate. This light was not burning at the time the plaintiff opened the gate, but she could readily have turned it on. Had she done so, light reflected from it would have entered the room she was about to enter. Besides these means of determining whether the trap door was open or closed, there were still other methods available.

The plaintiff had worked in this small drug store for four months. She admitted that she was familiar with these lights and switches. She had been through the trap door, down the stairs and into the basement on several occasions. She knew that at times the trap door remained open. The majority quoted the following from the plaintiff's testimony: "I looked into the room and didn't see any light, and it didn't look to me like the trap door was open and I seen my apron and stepped in and reached for it." The door was actually open, and she fell down the stairs. The plaintiff was asked by the trial judge, "I would like to ask you whether or not this light was turned on in the basement

when you arrived there at the gate?'' and she replied, ''No, sir, I looked in and it wasn't on.'' Next, in reply to a question asked by defendant's counsel, she answered, ''I walked to the gate, and I looked straight in, straight down, to see if I could see a light.'' She was further asked, ''But you knew if you so desired you could turn the light on in the basement, or could turn a light on in the prescription room? A. Yes.

''Q. On this occasion you didn't see fit to do so. A. I had looked in already and everything looked all right to me and there was no occasion to turn it on.

''Q. If it was so dark you couldn't see, how did you know everything was all right or not? A. It looked all right to me.

''Q. You couldn't see the floor in there? A. No, sir.

''Q. Then if you couldn't see the floor you wouldn't or couldn't know whether the trap door was open or closed, would you? A. No, sir.''

These questions were followed by others in which she was finally asked whether she could have seen the staircase if she had turned on the basement light. She made the answer which we have already quoted. ''If I had done so, yes, sir, I could have seen.''

Thus, it is seen that means were at hand which, if employed, would have enabled the plaintiff to know whether the trap door was open or closed. A mere flip of the switch, which was only three or four inches from her hand, would have shown the opening. But, instead of turning on the switch and ascertaining whether there was something to step upon before she proceeded, she took a step in the dark. We have quoted her testimony wherein she stated that she took the step when she could not see the floor. Further, according to her testimony above quoted, her inability to see the floor made it impossible for her to tell whether the door was open

or closed. Of course, her inability to see the floor was due to the fact that it wasn't there—the door was open.

I believe that, under the circumstances, it was the plaintiff's duty to assure herself that she had something to step upon before she proceeded. She was fully aware of the dangers present in this place. Instead of turning on the light she thoughtlessly took a step in the dark—she took a chance. Her omission to turn on a light when the switch was immediately at hand, in my opinion, was contributory negligence upon her part. Being in the minority, I omit the citation of supporting opinions. I believe that she is not entitled to recover. I, therefore, dissent to that portion of the opinion which affirms the circuit court's judgment against the defendant, Ex-Cel Pharmacy.

RAND, J., concurs in this dissent.