Argued April 12, affirmed April 25, 1956

# HUNT *v.* PORTLAND BASEBALL CLUB
### 296 P. 2d 495

*Ernest J. Burrows,* Portland, argued the cause for appellant. With him on the brief was George H. Layman, Newberg.

*David Fain,* Portland, argued the cause for respondent. On the brief were Black, Kendall & Fain and John J. Higgins, Portland.

Before WARNER, Chief Justice, and ROSSMAN, LUSK, BRAND and PERRY, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff from a judgment which the circuit court entered in favor of the defendant after it had sustained a motion made by the latter for the award of judgment to it notwithstanding the verdict of the jury in favor of the plaintiff. The amount of the verdict was $2,450. The judgment notwithstanding the verdict recited:

> "It appearing to the court that a motion had been made by defendant for a directed verdict; that said motion, in the opinion of the court, should have been granted."

The plaintiff's cause was based upon a charge that August 8, 1952, while the plaintiff, his wife and some friends, Mr. and Mrs. Harvey Park, were leaving the defendant's baseball park where they had been paid

patrons, the plaintiff was struck by a foul ball. The complaint, in charging negligence, alleged:

"At the time and place above indicated, the defendant failed and neglected to provide the plaintiff with a safe and protected means of exit and passageway from its premises."

The group of four left the game near the close of the ninth inning and were still in the grandstand when the mishap occurred. The seats which they had occupied were in the non-screened part of the stadium.

The plaintiff-appellant presents a single assignment of error. It reads:

"The Circuit Court erred in making and entering an order awarding, and in entering judgment for the defendant and against the plaintiff notwithstanding a verdict rendered for the plaintiff."

The following brief review of the evidence adopts the version most favorable to the plaintiff.

August 8, 1952, the plaintiff, his wife and the other couple that we have mentioned visited as paid patrons the defendant's Vaughn Street baseball park. The defendant maintains a baseball team in the Pacific Coast League, and on August 8 it was playing a league game. The plaintiff and the other members of his party had seats opposite third base that were unprotected by screening. All four were aware of the fact that the section in which they were seated was not screened and realized that they would have to be on the lookout for foul balls. In fact, the plaintiff testified that when his party took their seats one of them remarked "We'll have to watch out for foul balls, sitting here." The stadium had a seating capacity of 10,000. The part to the rear of home plate was protected by a screen 199 feet long. That part had

2,500 seats. The evidence indicates that some baseball patrons like to view the game from seats back of home plate, but that area of a stadium is exposed to greater danger from flying balls than the other parts and the spectators seated there have less opportunity to avoid the dangers than those who are located in other sections of the structure. The record suggests that since the patrons back of home plate are subjected to dangers of wild pitches and foul balls which they cannot readily avoid, ball parks frequently erect screens for their protection. Other visitors at the park, so the record indicates, prefer to watch the game without the interference of an intervening screen.

The plaintiff had been in the defendant's baseball park often and was intimately familiar with baseball. He termed himself a fan and went to the games as frequently as opportunity offered. Although his home is in Portland, his fondness for the game had caused him to attend games in Seattle, San Diego and San Francisco. He testified, "I have sat in the bleachers lots of times." He freely conceded that he knew that one of the incidents and dangers of the game is the entry of foul balls into the bleachers. We quote from his testimony:

"Q And foul balls occasionally end up in the stands. Isn't that correct?

"A I have seen a lot of them.

"Q You have seen them end up in the stands?

"A Yes.

"Q Have you seen anybody get hit by a baseball?

"A Yes, I am sure I have.

"Q So that you know that one of the incidents of sitting at a ball game of that kind is the prob-

ability of getting hit on occasion. That is a fair statement, isn't it?

"A  Yes, it is.

\*  \*  \*

"Q  You are perfectly familiar with the game, are you not, sir?

"A  Yes, sir.

\*  \*  \*

"Q  Mr. Hunt, you have seen these foul balls hit before, haven't you?

"A  Yes.

"Q  And you have seen them go into the stands, haven't you?

"A  Sure."

We have mentioned the fact that when the plaintiff was struck he had left his seat and was walking along a passageway which led to a nearby exit. He had reached a place where he was confronted with one or two steps that he had to ascend on his way to the exit. Many other people were leaving about the time that he and his party were departing and the passageway was well filled with patrons slowly moving toward the exit. All were interested in the closing moments of the game and had their eyes upon the batter as they slowly shuffled along the crowded passageway. The plaintiff described the situation in this way:

"They was all moving out of the park very slowly, watching the game as they left. I was doing likewise. \*  \*  \* Naturally they was going to see it to the end if they could, but they still kept moving."

His wife added:

"We were going slowly and I know we were looking back at the batter. We were watching the ball. We realized that a foul ball could hit any of us."

Mr. Park, who was immediately to the rear of the plaintiff, testified:

"* * * we moseyed along * * * sort of watching the game as you watch for the last out to be made."

The two women were ahead of the plaintiff and had already ascended the step or two which we have mentioned when the plaintiff reached that spot. At that moment he turned from the batter, looked at the step and was struck by the foul ball.

When the plaintiff was struck he was 96 feet from the batter, whose name was Hank Art. He conceded that if he had watched the batter he would have seen the ball and would have had sufficient time to have dodged. His exact words were:

"Q So that is a fair statement, is it not, that you neither saw Mr. Art hit this ball nor did you see the ball coming towards you?

"A No; had I, I would have had time to duck.

"Q Pardon?

"A I would have had time to duck if I had seen it.

* * *

"Q You have already told us, Mr. Hunt, that had you been looking you could have ducked.

"A That is right.

"Q And the reason for that, is it not, that there is enough distance intervening between the batter and the third baseman, or, as you put it, where you were standing across from third base, that had you watched Mr. Art you could have seen the ball coming and ducked. That was your expression, wasn't it?

"A That is right, I was in line and I was right at the exit, like I say, and I was just getting ready to proceed out of the park."

The defendant's ball park has a broader screen than most of the other parks which are occupied by teams in the Pacific Coast League and, according to uncontradicted testimony of the manager of defendant's baseball park, the other clubs in the Pacific Coast League "have exits similar to ours." If any club anywhere employs screened exits and passageways, the record does not disclose the fact.

The above constitutes a sufficient resume of the evidence.

We shall now consider the plaintiff-appellant's contention that the evidence above reviewed shows that the defendant was negligent. *Curtis v. Portland Baseball Club,* 130 Or 93, 279 P 277, had its situs in the same stadium as the case at bar. The plaintiff in that case was seated behind the screen which we have mentioned, but at that time the screen was only 150 feet long. He claimed that a foul-tipped ball somehow curved around the end of the screen and struck him. The circuit court entered judgment in his favor. In reversing the judgment and ordering a nonsuit, this court spoke as follows:

"* * * Under the law, defendant was obliged to exercise reasonable care and diligence commensurate with the danger involved, to protect its patrons from injury. Plaintiff, in the absence of notice to the contrary, had the right to assume that defendant would exercise care in maintaining the premises in a reasonably safe condition. Being in the business of providing public entertainment for profit, the defendant was required to use due care to protect its patrons from injury. It was not, however, an insurer of their safety. It was required to use only that degree of care exercised by persons of ordinary prudence and caution en-

gaged in similar business. It was not bound to guard against highly improbable dangers or perils.

* * * * *

" * * * The defendant, in constructing 150 feet of screen and maintaining it in good condition did its full duty in protecting patrons who might reasonably be expected to be hit by a foul ball. To hold that defendant should be obliged to erect a winged screen as claimed by plaintiff would be subjecting it to a standard of care not warranted by law. We fail to see wherein the defendant has been remiss in its duty."

The facts recounted in the preceding paragraphs show that the defendant provided protective screening for patrons who were seated in the part of the grandstand which afforded them inadequate opportunity to avoid foul balls. The plaintiff's seat enabled him to watch the batter and was sufficiently distant from the home plate so that he could readily avoid foul balls. Likewise, when he left his seat and headed for the exit he was able to see the batter, and he acknowledged that he had adequate opportunity to evade foul balls. The holding of the Curtis decision indicates that the defendant was not negligent.

*Adair Adm'x v. Valley Flying Service,* 196 Or 479, 250 P2d 104, was an action by the administratrix of one Darius C. Adair, who lost his life when an airplane, of which the defendant was lessor and of which one Redding was lessee and operator, crashed. The action was predicated upon a charge that when Redding applied to the defendant for the airplane he (Redding) was intoxicated and the defendant was aware of that fact. In denying liability, the decision ruled that Adair was guilty, as a matter of law, of contributory negligence. It said:

" * * * By voluntarily becoming a passenger in the airplane operated by Redding when he, Red-

ding, was visibly intoxicated as alleged, Darius C. Adair must be presumed to have acquiesced in such negligent operation. As a matter of law, he failed to exercise that degree of care for his own protection that a reasonably prudent person would have exercised in like or similar circumstances and, therefore, was guilty of contributory negligence."

■■ We believe that the same observation is warranted in the case at bar. If the defendant should have provided screening for the plaintiff's protection, the plaintiff was fully aware of the lack of the protection, and yet stayed in the ball park. If the defendant was remiss in any duty concerning screening, the plaintiff "must be presumed to have acquiesced" in the existing situation as he was fully apprised of its nature, but, in our opinion, the record discloses no negligence upon the defendant's part.

The answer averred assumption of risk. The plaintiff-appellant's brief states:

"The doctrine of Assumption of Risk in Oregon applies only in situations involving a master and servant relationship, and such doctrine does not apply in cases involving a baseball club proprietor-patron relationship. Furbeck v. Gevurtz, 72 Or 12, 143 P 654, 143 P 922; Whisler v. United States National Bank of Portland, 160 Or 10, 82 P2d 1079."

We quote the following from Restatement of the Law, Torts, § 893:

"A person who knows that another has created a danger or is doing a dangerous act or that the land or chattels of another are dangerous, and who nevertheless chooses to enter upon or to remain within or permit his things to remain within the area of risk is not entitled to recover for harm unintentionally caused to him or his things by the

other's conduct or by the condition of the premises, except where the other's conduct constitutes a breach of duty to him or to a third person and has created a situation in which it is reasonably necessary to undergo a risk in order to protect a right or avert a harm.''

Comment, Illustration (1), follows:

''A is illegally and dangerously setting off fireworks on his land adjacent to a public highway, thereby endangering people on the highway. B, a neighbor, fully conscious of the risk of so doing, approaches on the highway for the sole purpose of seeing the fireworks and without A's knowledge stops to watch A. B is hurt by an apparently sound but defective rocket. A is not liable to B.''

In its practical manner, 65 CJS, Negligence, p 848, § 174, gives us this statement of the doctrine:

''While it has been held that the doctrine of assumption of risk, in its primary or usual meaning, is limited to controversies between master and servant and is not applicable in the absence of any contractual relation between the parties, there is ample authority for the view that in its broader sense the doctrine of assumption of risk may extend beyond contractual relations and may apply to preclude recovery in negligence cases, although the effect of the doctrine in the two different kinds of cases may not be the same. In any event, when plaintiff has brought himself within the operation of the maxim, Volenti non fit injuria, he cannot recover. The doctrine discussed herein, by whatever name it may be designated, is said to rest on, or be in its nature, effect and import the equivalent at least of, the principle expressed by the maxim Volenti non fit injuria, which is itself predicated on the theory of knowledge and appreciation of the danger and voluntary assent thereto.

''Accordingly, it has been held to be the rule,

generally referred to as the doctrine of assumption of risk, and sometimes referred to as the doctrine of 'incurred risk,' or 'taking the risk or hazard,' or 'running the risk,' that one who voluntarily exposed himself or his property to a known and appreciated danger due to the negligence of another may not recover for injuries sustained thereby, even though he was in the exercise of ordinary care or even of the utmost care. Corollaries of this rule are that to acquiesce in, or consent to, a course of negligent conduct is to assume the risks incident thereto, that one having a choice of reasonably convenient ways assumes the risk of a dangerous one, and that one who voluntarily attempts a rash, imprudent, and dangerous undertaking is to be presumed to have assumed the risk incidental thereto.

"The mere encountering of a risk, by doing something dangerous, does not, legally speaking, constitute assumption of risk; it is only when the risk exists in spite of the exercise of due care or when the risk results from negligence which is obvious that it is assumed by the person injured; and the law of assumed risk applies generally to those dangers attendant on the act or method when done in a manner free from negligence. Assumption of risk arises where the proximate cause of an injury is referable to the conduct of the injured person after knowledge of the risk of injury, and not to the conduct of defendant who in the first instance created the risk; but it is predicated on the factual situation of defendant's acts alone creating the danger and causing the accident, with plaintiff's act being that of exposing himself to such obvious danger with appreciation thereof, which resulted in the injury. The test of whether plaintiff assumed the risk of a danger from which injury resulted is whether an ordinary prudent person would under the same or similar circumstances have incurred the risk which plaintiff's conduct involved."

Prosser, Law of Torts, 2d ed, p 303, says:

"* * * Thus, a spectator entering a baseball park may be regarded as consenting that the players may proceed with the game without taking precautions to protect him from being hit by a ball."

We turn now to page 307:

"In by far the greater number of cases, the consent to assume the risk is not expressed but is found to be implied from the conduct of the plaintiff under the circumstances. By entering freely and voluntarily into any relation or situation which presents obvious danger, the plaintiff may be taken to accept it, and to agree that he will look out for himself, and relieve the defendant of responsibility. Those who participate or sit as spectators at sports and amusements assume all the obvious risks of being hurt by railway coasters, flying balls, fireworks explosions, or the struggles of the contestants. 'The timorous may stay at home.' The guest who accepts a ride with an automobile driver assumes the risks of his obvious incompetence, or of the evident defects in the car. One who enters upon the premises of another, even as a business visitor, assumes the danger of all known or obvious conditions which he finds there. The consent is found in going ahead with full knowledge of the risk."

The first decision of this court which mentioned the doctrine of assumption of risk is *Dubiver v City Railway Co.*, 44 Or 227, 74 P 915, 75 P 693. The plaintiff in that case, a 15-year-old boy, who appeared by his guardian, was injured when one of the defendant's streetcars collided with a delivery wagon that he was driving upon a public street of Portland. The boy was in the employ of his father, but was not employed by the defendant and had no contractual relationship with it. It is difficult to perceive how the case could

have called for a declaration about assumption of risk since no such defense was pleaded and there was no assignment of error upon the subject. The decision said:

> "The doctrine of the assumption of risks and hazards incident to the occupation in which a person is engaged does not apply otherwise than as between master and servant, but no such relation existed between the defendant and the plaintiff's minor herein."

The quoted statement possibly was not well phrased, and we believe that it has been misunderstood. We think that the author of the decision intended his words to mean that in the master and servant relationship the doctrine is applicable, but that it can be invoked only by the master, and not by a stranger to the relationship. *Gentzkow v. Portland Railway Co.*, 54 Or 114, 102 P 614, is the next instance in which this court mentioned the doctrine of assumption of risk. Neither a relationship of employer and employee nor one of any other contractual nature existed between the parties to that action. The court said:

> "Plaintiff was not a servant of defendant and no contractual relation existed between them. Hence, the doctrine of assumption of risk, as distinguished from contributory negligence—that is to say, from the failure of the plaintiff to exercise ordinary care to avoid injury—does not apply in this case, unless he knew and appreciated the danger and voluntarily put himself in the way of it."

It will be observed that the court perceived that the doctrine is applicable in the two-fold categories of (a) master and servant and (b) contractual relationships. The court almost envisaged the rule as later

phrased by the American Law Institute's Restatement.

*Furbeck v. I. Gevurtz & Son,* 72 Or 12, 143 P 654, 143 P 922, is another case in which no contractual relationship, master and servant or otherwise, existed between the parties. The plaintiff was injured while walking upon a downtown public street of Portland. A temporary canopy, which a contractor had erected over the sidewalk, collapsed and fell upon the plaintiff. We now quote from the decision:

"A text-writer, illustrating the divergence of these defenses, says:

"'The doctrine of the assumption of risk, as distinguished from contributory negligence—that is to say, from the failure of the person injured, or the custodian of such person, to exercise ordinary care to avoid the injury, is said not to apply in the case of persons not sustaining the relation of master and servant to each other, and not having contractual relations with each other, unless the person injured knows and appreciates the danger and voluntarily puts himself in the way of it': 1 Thomp. Com. Law Neg., par. 184.

"The text thus quoted seems to have formed the basis of the clause of the answer referred to, except that it is not averred in this part of the defense that the plaintiff knew and appreciated the danger. But, however this may be, as no contractual relation existed at the time of the accident between the parties now before this court, the defense of assumption of risk was inapplicable, for such a plea can be invoked only in cases between master and servant: *Dubiver* v. *City Railway Co.,* 44 Or. 227 (74 Pac. 915, 75 Pac. 693, 1 Ann. Cas. 889). No error was committed in refusing to give the instruction requested."

The decision correctly stated the doctrine, but its declaration that "such a plea can be invoked only in

cases between master and servant" was erroneous. *Dubiver v. City Railway Co.*, which the decision cited, did not warrant the statement; in fact, the case called for no statement whatever concerning the doctrine.

In *Eldred v. United Amusement Co.*, 137 Or 452, 2 P2d 1114, the relationship between the plaintiff and the defendant was akin to that of the parties in the case now at bar. In that case, the plaintiff, who was a paying guest in the defendant's amusement park, was injured while riding upon a rotating, power-driven device known as the "Merry Mix Up." After he had purchased a ticket and had taken the seat in the Merry Mix Up selected for him by the attendant, the latter fastened a safety chain around the plaintiff so as to preclude the possibility that the swiftly rotating device would hurl him from the seat. When the Merry Mix Up achieved high speed the safety chain gave way and the plaintiff was thrown to the ground, 18 feet below. The decision said:

> "* * * If the device had been properly inspected; if the chain was not defective; if the chain had been properly fastened; if plaintiff had been warned of the danger; then it is not probable that plaintiff would have fallen from the seat."

Normally, the doctrine of assumption of risk does not extend to hidden hazards and to others of which the individual who becomes injured had no knowledge. We quote again from the decision:

> "This assignment of error is based on the failure of the court to give the following instruction:
>
> " 'I instruct you that if you find from the evidence in this case that the plaintiff did, for the sake of a thrill, knowingly and appreciating the dangers in using this concession in the manner that he did use it, if there were any dangers, and that

the plaintiff did freely and voluntarily make use thereof, then this plaintiff did assume the risk of using this swing and your verdict must be for the defendants.'

"The doctrine of assumption of the risk does not obtain in the state of Oregon except between master and servant: Dubiver v. City Railway Co., 44 Or. 227 (74 P. 915, 75 P. 693, 9 Ann. Cas. 889); Furbeck v. Gevurtz, 72 Or. 12 (143 P 654, 922).

" 'As the practical equivalent of the term contributory negligence one frequently finds in the cases the expression "Assumption of the risk." It is said that one who knows and appreciates the danger assumes the risk thereof.' 20 R.C.L., 109. (See 18 R.C.L. et seq.)."

It will be observed that although the decision declared that assumption of risk is not a defense in cases of that kind, the facts called for no statement of that nature. It is evident that the plaintiff had not assumed the risks which caused his injury. *Dubiver v. City Railway Co.,* supra, and *Furbeck v. Gevurtz,* supra, did not sustain the court's statement.

From *Whisler v. United States National Bank of Portland,* supra, we take the following:

"We think plaintiff at the time of the accident had the status of an invitee rather than that of an employee: * * *. If plaintiff was an invitee the defense of assumption of risk is not involved."

The plaintiff in that case was actually an employee of the defendant, but at the time of her injury was off duty. Therefore, she was deemed an invitee. The decision did not limit the application of the doctrine to the master-servant relationship.

The foregoing are our precedents. The thought that the defense of assumption of risk can be invoked only

in master and servant cases can be traced back clearly to *Dubiver v. City Railway Co.,* supra. But that decision when carefully read does not support the conception of the holding. It holds that although the doctrine is applicable in master and servant cases, one who is not the servant's master cannot avail himself of the defense. Any other interpretation of the decision would do no credit to Mr. Justice WOLVERTON, an able jurist, who was the writer of that decision. The Gentzkow decision, far from supporting the plaintiff's position, warrants the application of the principle in this case. The same can be said of the Furbeck opinion, with the exception of its unfortunate interpretation of the Dubiver decision. The Eldred case reached the right result, but failed to perceive that one does not assume risks of which he cannot have knowledge. *Adair Adm'x v. Valley Flying Service,* supra, in declaring "Darius C. Adair must be presumed to have acquiesced in such negligent operation", came close to embracing the doctrine of assumed risk. Its failure to have done so was due to the condition of the pleadings. *Burch v. Peterson,* 207 Or 232, 295 P2d 868, decided April 11, 1956, which held that a social guest takes the premises as he finds them, with the exception of concealed entrapments, lends support to the view that one who voluntarily exposes himself to known and appreciated dangers may not recover for injuries sustained thereby. ORS 30.110 and 30.120, which prevent a nonpaying guest from recovering damages from his host in automobile and airplane accidents unless the guest can prove evil intention, gross negligence or intoxication, denote a social policy that one who voluntarily exposes himself to a known danger should be held to have assumed the risks thereof.

It is clear from the plaintiff's own testimony that he was intimately familiar with the game of base-

ball and the risks inherent in being a spectator at a game. He knew and appreciated the circumstances when he took his place in the unscreened part of the stadium. A conclusion is warranted that his appreciation and his knowledge of risks were chargeable to him as long as he remained in the park. In the language of the Restatement, plaintiff was in the position of one "who knows that another  *  *  *  is doing a dangerous act *  *  *, and who nevertheless chooses to enter upon or to remain within the area of risk." We agree that such a person

> "is not entitled to recover for harm unintentionally caused to him  *  *  *  by the other's conduct or by the condition of the premises, except where the other's conduct constitutes a breach of duty  *  *  * and has created a situation in which it is reasonably necessary to undergo a risk in order to protect a right or avert a harm."

The language just quoted appeals to us as well considered and as constituting a useful statement of the controlling principle in the light of legal and social policy. The Oregon statements of the rule were made in cases that did not call for the application of assumption of risk. We surmise that before the statements were made, adequate and accurate consideration was not given to that principle of law. So far as those statements are contrary to what is expressed herein they are overruled.

We are brought to the conclusion that plaintiff by his own act of knowingly placing himself in an area of appreciated risk, which was not created by any unreasonable conduct of the defendant, bars him from recovery for his injuries.

It is seen from the foregoing that the challenged judgment can be sustained upon two grounds: (a) the

record discloses no negligence, and (b) the plaintiff-appellant had assumed the risk of injury. Although we have full confidence in the first ground, we prefer the second.

The assignment of error discloses no merit. The judgment of the circuit court is affirmed.