Larche R. McLEMORE, Appellant,

v.

James HARRIS, Appellee.

No. 197.

Supreme Court of Alaska.

Sept. 5, 1962.

Charles E. Tulin, Anchorage, for appellant.

James E. Fisher, Kenai, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

The principal question before us on this appeal is whether the lower court erred in finding that Larche R. McLemore, the defendant below, was guilty of gross or wanton negligence in parking his motor vehicle on a "bush" airfield.

The term "bush airfield" or "bush airstrip" connotes in Alaska an unregulated field for light aircraft.[1] These fields played an important part in the settlement and development of the Territory of Alaska and continue to do so under statehood. They are often found adjacent to a village but in many instances have been carved out of the wilderness to accommodate miners, prospectors, trappers and fishermen in near and faraway places. They are usually constructed on the sandbar of a river, lake

[1]. Bush airfields have been specifically referred to by that name by the Alaska state legislature in S.L.A.1960, ch. 174, § 1, which provides for the issuance of general obligation bonds, "for the purpose of paying all or part of the cost of acquiring, constructing, equipping, and making necessary capital improvements to bush airfields." See also S.L.A.1961, ch. 65.

The general term "airport" has been defined by the legislature as "any area of land or water designed for the landing and taking-off of aircraft and utilized or to be utilized as a point of arrival or departure by air." S.L.A.1951, ch. 12, § 1 (§ 32–5A–2(1) A.C.L.A.Cum.Supp. 1957).

shore, or other suitable ground by removing trees, brush, rocks and other obstructions. Sometimes the runway for the wheels of the aircraft is "dragged" to provide a smoother landing surface. In the winter season they may even be laid out upon frozen bodies of water. Sometimes they are located on private property and at other times on the public domain.

In 1937 the territorial legislature made it unlawful to park or place upon the runway of any aviation field in Alaska any wagon, sled, vehicle or other article unless used in the construction or repair of such field.[2] Then in 1951 the legislature further provided:

"It shall be unlawful for any person to place any object on the surface of any public or private airport which because of its nature or location might cause injury or damage to any aircraft or person riding therein."[3]

With that bit of history in mind we turn to the case at hand. The plaintiff, James Harris, brought this action in the district magistrate court to recover for damages to his Piper PA–11 airplane, allegedly caused by collision with an obstruction "wilfully or recklessly" left by the defendant on the airstrip where the plaintiff landed the plane. The defendant denied the allegations of the complaint and charged the plaintiff with contributory negligence in the premises.

The magistrate court, sitting as trier of the facts, found that the defendant, with full knowledge that the field in question was used as an airfield, was "grossly negligent or wantonly negligent to park [his truck] there." Judgment was for the plaintiff for the full amount of the damages claimed. An appeal was taken to the superior court where the case was heard on the record made in the magistrate court and the judgment affirmed. An appeal to this court followed.

Since the defendant has challenged the finding of the trial court as to negligence, we must take the view of the evidence most favorable to the prevailing party, in this case the plaintiff, and give him the benefit of all inferences in his favor which may be drawn from the facts proved.[4] The evidence in the record most favorable to the plaintiff is as follows:

The Oshetna Strip is a bush airfield, which was built by the plaintiff, with some help from others, on the public domain, specifically on a creek bed and sandbar at the confluence of the Big Oshetna and Little Oshetna Rivers, about 45 miles from the town of Eureka. The gravel bar upon which the airstrip is located is over 900 feet in length and about 60 feet wide with a clump of willows on one side and water on the other. The actual runway is on the willow side of the field and is only about 15 to 20 feet in width. It was once dragged with a 12-foot railroad iron and shows wear from the wheels of aircraft using it. From pictures admitted as exhibits at the trial it appears that there was enough open space between the runway and the willows to allow for the spread of one wing of a light plane. The Oshetna Strip is used only during the hunting and fishing seasons. As many as six planes have been seen on the strip at one time.

On the evening of August 19, 1959 the plaintiff flew in his Piper aircraft to land some gear at the Oshetna Strip. As he came in for the landing he observed defendant's truck (also referred to in the record as a swamp buggy) parked on the strip and obstructing the runway. So he made a pass over the field and shouted to the defendant and the men with him to move the truck off the strip. The defendant promptly moved the truck but only a few feet. Nevertheless the plaintiff was able to land his plane without mishap and stayed on the

2. S.L.A.1937, ch. 71, § 1 (now § 32–4–6 A.C.L.A.1949).

3. S.L.A.1951, ch. 43, § 5(a) (§ 32–7–5(a) A.C.L.A.Cum.Supp.1957).

4. Los Angeles Shipbuilding & Drydock Corp. v. United States, 289 F.2d 222, 226–227 (9th Cir. 1961); Chirikoff Island Cattle Corp. v. Robinette, 372 P.2d 791 (Alaska 1962).

field that night. Immediately after landing and again on the following morning the plaintiff explained to the defendant the dangers inherent in parking the truck on the strip and asked him to park it in the brush or somewhere else off the strip. The defendant finally complied "and moved it out of there."

Later on the morning of August 20, the plaintiff came in for another landing on the Oshetna Strip, this time with a passenger whom he had picked up at Eureka. Before landing he checked the wind and made certain that there were no planes on the field. The windshield of his own plane was splattered by rain from intermittent showers, and he testified that on account of this condition "I had poor visibility in front of me." Not until just as he set the plane down on the runway did the plaintiff see the defendant's truck parked on the airstrip right at the edge of the willow patch. The front end of the truck was headed toward the willows but at such an angle that about eighteen inches of the right wing tip of the plane struck the left tail gate of the truck. This caused the plane to spin around and to dig its left wing into the ground.

As stated earlier the runway of the airstrip measured 15 to 20 feet in width. Other facts to be noted are that the total wingspread of the plaintiff's airplane was 36 feet; that the distance from the left tail gate of the truck to the center of the runway was between 12 and 15 feet; that it was at the most 25 feet from the edge of the brush where the truck was parked to the center of the runway; that a pilot coming down for a landing on the strip would "have to go close to the brush to sit down and square up with the strip," as the plaintiff explained; that the defendant admitted that he knew the Oshetna Strip to be an airfield;

that the defendant and his companions were gathered around the truck and watched the plaintiff come in for a landing; and that immediately after the accident, upon being reproved by the plaintiff for having parked the truck on the airstrip again, the defendant stated that he was sorry and then moved the truck completely into the brush when told that a second plane was following in for a landing.

■ In the face of such evidence in the record we cannot say that the magistrate court erred in its finding that the defendant was guilty of gross or wanton negligence. The behavior of the defendant in deliberately parking his truck in the position it was when struck by the plaintiff's aircraft, with full knowledge of the hazards he was thereby creating, evidenced a reckless disregard of possible consequences and indifference to the rights of others and supported the trial court's finding.[5]

■■ Another error specified by the defendant is that the trial court erred in failing to find that the contributory negligence of the plaintiff was a defense barring plaintiff's recovery. We need not consider that specification of error for two reasons. First, it is not separately set out as required by our rule 11(a) but has been combined with another alleged error in a single specification of error.[6] In Parks v. Brown [7] we held that a specification of error which sets out more than one error is improper and does not need to be considered by this court. Secondly, ordinary contributory negligence on the part of the plaintiff is not a defense to an action for injury caused by the defendant's reckless or wanton misconduct.[8] Only if the plaintiff's own conduct is wilful or wanton will it be balanced against similar conduct on the part of the

5. See McDonald v. International & G. N. R. Co., 21 S.W. 774, 775 (Tex.Civ.App. 1893).

6. The plaintiff's second specification of error reads: "That the trial court erred in finding the defendant to be guilty of gross and wanton negligence *and* in failing to

find that the contributory negligence of plaintiff was a defense barring plaintiff's recovery." [Emphasis added.]

7. 368 P.2d 220 (Alaska 1962).

8. Falls v. Mortensen, 207 Or. 130, 295 P. 2d 182, 184–187 (1956); Prosser, Torts § 51 at 289–90 (2d ed. 1955).

defendant and recognized as a defense.[9] The defendant in the instant case did not allege or undertake to prove any wanton or reckless misconduct on the part of the plaintiff as a bar to recovery.

For the reasons set forth above, we find no error in the record and therefore the judgment below is affirmed.

So ordered.

9. Cawog v. Rothbaum, 165 Cal.App.2d 577, 331 P.2d 1063, 1071 (1958); Prosser, op. cit. supra note 8, at 290.