Herbert **LEAVITT**, Individually and as Administrator of the Estate of William Leavitt, Deceased, Appellant,

v.

Russell E. **GILLASPIE**, Jr., and Cripple Creek Resort, Inc., Appellees.

Russell E. **GILLASPIE**, Jr., Appellant,

v.

Herbert **LEAVITT**, Individually and as Administrator of the Estate of William Leavitt, Deceased, Appellee.

Nos. 800, 803.

Supreme Court of Alaska.

June 24, 1968.

---

2. Law of Oct. 19, 1864 § 598; Hill's Ann. Laws of Oregon § 825 (1892).

3. State v. Witham, 6 Or. 366, 367 (1877).

Millard F. Ingraham and Barry W. Jackson, Fairbanks, for appellant and appellee Herbert Leavitt.

Edward A. Merdes and Howard Staley, of Merdes, Schaible, Staley & DeLisio, Fairbanks, for appellee and appellant Russell E. Gillaspie, Jr.

Before NESBETT, C. J., and DIMOND and RABINOWITZ, JJ.

## OPINION

DIMOND, Justice.

William Leavitt died from injuries received when an automobile, driven by Russell E. Gillaspie, Jr., left the highway and overturned. This action for wrongful death was brought by the decedent's administrator, Herbert Leavitt, against Gillaspie and the Cripple Creek Resort, Inc.[1] The jury returned a verdict in favor of Gillaspie and Leavitt has appealed.

### Leavitt's Appeal

*Gross Negligence.*

In his opening statement, Gillaspie's counsel admitted that Gillaspie was negligent. Leavitt requested the court to instruct the jury as follows:

> Ordinary contributory negligence on the part of plaintiff is not a defense to an action for injury or death caused by the defendant's reckless or wanton misconduct. Only if the Plaintiff's own conduct is willful or wanton will it be recognized as a defense.

The court refused to give this instruction. Leavitt contends that by refusing to give this instruction the court refused to submit to the jury the issue of whether Gillaspie had been guilty of gross negligence, or to put it in other words meaning the same thing, willful, wanton or reckless misconduct. The evidence from which it must be determined whether or not this contention is correct may be briefly summarized as follows:

Gillaspie, the decedent and Mike Sheehan, and two other persons, were drinking beer at the Malemute Saloon in Ester, Alaska, at approximately 1:30 a. m., the night of the fatal accident. They drank beer together for one and a half or two hours taking turns buying pitchers of beer, each of which held about three glasses. The amount of beer consumed by the five persons amounted to four or five pitchers. Sheehan, the decedent and Gillaspie then rode to the University of Alaska in Gillaspie's car with Gillaspie driving. After spending about fifteen minutes at the University, the three returned to the Malemute Saloon. There they each purchased a pitcher of beer, and taking the pitchers with them, started back to the University with Gillaspie driving. On the way to the University defendant's car failed to make a curve, left the road, and rolled or flipped over two or three times throwing decedent from the car where he suffered fatal injuries.

Gillaspie testified that on the first trip back to the University he felt "high" but "not intoxicated," that the beer he consumed never impaired his ability to drive, and that he kept control of the car at all times. He described his driving as "good." He estimated his speed on the second and fatal trip back to the University at "over

1. Prior to trial, Cripple Creek Resort, Inc., after first denying the allegations of the complaint for wrongful death in its answer to the complaint, executed a confession of judgment for the sum of $100,-000, and a judgment in that amount was entered in favor of decedent's administrator against Cripple Creek Resort, Inc.

50," although he admitted telling a police officer right after the accident that he was going from 65 to 70 miles an hour. Nobody said anything to Gillaspie about his driving on the fatal trip, and he did not think that his driving was impaired by his drinking. As regards the accident, Gillaspie testified that he "just lost control of the car * * * instead of * * * making the turn, the car kept on going straight." He knew of the steep shoulders of the curve and the lack of banking. He claimed to have a "pretty good capacity for drinking."

Mike Sheehan, the other passenger on the fatal trip, testified that other than each of the five persons buying a round of beer, he "couldn't say" how much beer the group consumed. He estimated Gillaspie's speed on both trips to the University at "60 and 70." He described Gillaspie as "the least intoxicated" and "intoxicated," and said "I don't remember" in response to questioning about Gillaspie's driving.

Donald Pearson, vice president and stockholder of Cripple Creek Resort, Inc., testified to Gillaspie's presence at the Malemute Saloon the night of the fatal accident but denied remembering serving him anything to drink. He did remember that the decedent "seemed to be sober enough," but denied noticing the condition of the rest of the group. Pearson also denied giving the group permission to take the pitchers of beer out of the bar.

Dr. Raymond Evans testified on the basis of his autopsy of decedent that "something like a beer can or a beer mug or something of that nature or anything round, of that magnitude" pushed in decedent's abdominal wall and crushed his liver.

Sergeant Schlichtig of the Alaska State Police, the investigating officer of the accident, testified as to his observations of the car on the scene of the accident, of the condition of the road, and a reconstruction of the accident. Sergeant Schlichtig's reconstruction of how the accident occurred, based on his observation and experience, was that Gillaspie's car went into a sideways skid on the pavement, being lifted off of the right wheels onto the left. It continued along the shoulder, with the edge of the pavement scraping the paint off the car under the bottom of the door. It then left the ground at the end of the tracks to the first impact point, where it hit on its right rear, flipped again to the second impact point where it hit on its nose, and flipped over onto the railroad track, where it came to rest upside down pointing in the opposite direction of travel. The sergeant also testified that the road condition was good blacktop, free of ice and snow, moisture or loose gravel. The sergeant also testified that the odor of alcohol on all three persons in the car was quite strong.

■ Leavitt alleged in his complaint that Gillaspie was guilty of gross negligence. This allegation alone is not sufficient to justify an instruction on that subject. There must be an evidentiary basis for such an instruction.[2]

■ Where the question has arisen as to whether a directed verdict or a judgment notwithstanding the verdict should be entered with respect to an issue of negligence or contributory negligence, we have held that such issues are for the jury to determine where there is room for diversity of opinion among reasonable men as to whether a defendant is guilty of negligence or a plaintiff is guilty of contributory negligence.[3] We apply that same rule where the question is whether an instruction on the issue of gross negligence should be submitted to the jury for its consideration. If reasonable minds could justifiably have different views on the question of whether plaintiff was guilty of gross negligence, then the issue of gross negligence should

2. Groseth v. Ness, 421 P.2d 624, 629 n. 14 (Alaska 1966).

3. Mallonee v. Finch, 413 P.2d 159, 162 (Alaska 1966); McCoy v. Alaska Brick Co., 389 P.2d 1009, 1010 (Alaska 1964).

be submitted to the jury for determination. On the other hand, if the evidence is such that reasonable minds might reach only one conclusion, i. e., that from the facts presented there is no showing of gross negligence, then an instruction on such an issue is not justified.[4]

In order for one to be guilty of gross negligence, the evidence must show that he had full knowledge of the hazards he was creating by his actions, such as to evidence a reckless disregard of possible consequences and indifference to the rights of others.[5] There must be facts which would lead a reasonable man to realize that the actor's conduct under the circumstances not only creates an unreasonable risk of physical harm to another, but also involves a high degree of probability that such harm will result.[6] Gross negligence differs from ordinary negligence in several important particulars. As stated in the Restatement of the Law of Torts, Second:

It [reckless misconduct or gross negligence] differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind.[7]

We do not believe that the evidence shows a conscious choice of a course of action by Gillaspie with full knowledge of a serious danger to others such as to evidence a reckless disregard of possible consequences and indifference to the rights of other persons. Gillaspie was shown to have drunk some beer and to have travelled at a high rate of speed between the Malemute Saloon and the University of Alaska. There is no evidence showing that he was incapable of driving because of the beer he drank; and since he made the first trip to the University and back to the Malemute Saloon without incident, there was no reason to believe that when he started on the fatal trip there was a high degree of probability that the car would fail to make a curve and turn over. We believe that there was no room for diversity of opinion among reasonable men as to whether Gillaspie was guilty of gross negligence, and that reasonable minds could come to only one conclusion, i. e., that Gillaspie was not grossly negligent. The court did not err in declining to give the jury an instruction concerning gross negligence.

During his testimony Gillaspie admitted having entered a plea of guilty to a charge of reckless driving. With respect to such a plea, Leavitt requested the court to instruct the jury that "A plea of guilty is a confession on the part of a defendant of the truth of the material facts of the charge." The court refused to give the

---

4. Rocky Mtn. Prod. Trucking Co. v. Johnson, 78 Nev. 44, 369 P.2d 198, 202 (1962).

5. McLemore v. Harris, 374 P.2d 410, 412 (Alaska 1962).

6. Nichols v. Baker, 101 Ariz. 151, 416 P.2d 584, 586 (1966).

7. Restatement (Second) of Torts § 500 comment g at 590 (1965).

requested instruction and Leavitt assigns this as error.

Normally, a plea of guilty of a defendant in a criminal action is admissible against him in a civil action growing out of the same offense.[8] It would constitute evidence by way of an admission by a defendant which would tend to prove the truth of the matter admitted by the guilty plea. But here it is not clear what Gillaspie did admit by his plea of guilty to reckless driving. That offense is defined by statute as consisting of driving "carelessly, heedlessly or in willful or wanton disregard of the rights or safety of others", or in driving "without due caution or circumspection", or in driving "at a speed or in a manner so as to endanger or be likely to endanger a person or property."[9] The requested instruction did not specify which of the alternate grounds in the statute defining reckless driving applied to Gillaspie's case. Because it is not clear just what Gillaspie pled guilty to, the instruction was properly refused.[10]

*Contributory Negligence.*

The court instructed the jury on Gillaspie's affirmative defense of contributory negligence on the part of decedent. Leavitt claims this was error.

In Saslow v. Rexford, 395 P.2d 36, 41 (Alaska 1964), we defined contributory negligence as:

"conduct which involves an undue risk of harm to the person who sustains it." It is one's failure to exercise reasonable prudence for his own safety when he perceives danger to himself created by another's negligence.

Leavitt concedes that riding with a driver whom a reasonable man should know to be intoxicated may be contributory negligence. The question here is whether the evidence is such that reasonable minds could differ on the question of whether decedent knew or should have known that Gillaspie's capacity for driving had been impaired by reason of intoxication.

In Meade v. Meade,[11] the Virginia Supreme Court of Appeals stated:

[T]he fact that the host had been drinking and the guest had knowledge of this fact is not sufficient to establish contributory negligence as a matter of law. * * * The evidence must go beyond this and show that because of his drinking the driver's ability to drive was impaired, that the guest knew, or in the exercise of ordinary care should have known, this and yet entered or continued to ride in the car. Whether the guest knew or should have known that the intoxicated condition of the driver impaired his ability to drive is ordinarily a question for the jury.

Here the situation is one where decedent willingly, without protest, drove with a driver who had had several glasses of beer and, in the words of one witness, was "the least intoxicated," and who was driving at speeds of from 60 to 70 miles per hour. The question is whether, under these circumstances, decedent by staying with Gillaspie in his car acted with the care that a reasonably prudent person would have used under those circumstances.

In Zumwalt v. Lindland,[12] the Supreme Court of Oregon held that the issue of contributory negligence was properly submitted to the jury where there was evidence of the driver's drinking a substantial amount of beer, known to the plaintiff, and nothing more. The court said:

We need not decide, at this time, how much or how little beer at either end of the scale will require the court to

8. Monsma v. Williams, 385 P.2d 107, 110 (Alaska 1963).

9. AS 28.35.040.

10. Zenuk v. Johnson, 114 Conn. 383, 158 A. 910, 911–912 (1932); Sothern v. Vandyke, 114 N.J.L. 509, 174 A. 877, 879 (1934).

11. 206 Va. 823, 147 S.E.2d 171, 174 (1966).

12. 239 Or. 26, 396 P.2d 205, 210 (1964).

withdraw the question from the jury. We do hold, however, that upon the evidence in the case at bar a jury could say that the amount of alcohol consumed was sufficient to put a reasonable man upon inquiry concerning the fitness of his driver to convey him safely home. Upon such evidence, the jury could have found that the plaintiff failed to exercise that degree of care that a reasonable person would have exercised for his own safety.

There was no contention that the defendant was intoxicated. However, a jury could have considered from the youthfulness of the parties and from the manner in which they had been spending their time immediately prior to the accident that the defendant's ability to operate his vehicle safely had become impaired and that a reasonable person in the plaintiff's position should have known that it was unsafe to ride with the defendant under all the circumstances.

■ As in the foregoing case, we believe that the issue of decedent's contributory negligence was properly submitted to the jury for its determination. Considering the facts relating to Gillaspie's beer drinking and the speeds at which he drove his car on the first trip from the Malemute Saloon to the University, we believe that reasonable minds could differ as to whether decedent failed to exercise reasonable prudence for his own safety when he decided to ride with Gillaspie on the second, and fatal trip from the saloon to the University. The court's instruction to the jury on contributory negligence was not error.

*Testimony of Pearson.*

Gillaspie called as a witness, Donald Pearson, vice president and manager of Cripple Creek Resort, Inc., the corporation owning the bar where Gillaspie and decedent purchased and consumed beer prior to the accident. After questioning Pearson on other matters, Gillaspie's counsel asked this question: "Mr. Pearson, has Cripple Creek, Inc., been a defendant in this law suit?" Over plaintiff's objections, following a conference in chambers, the trial court allowed the witness to answer this question but prohibited further inquiry into the matter. The court said:

I am going to, as it stands, allow him to be—to answer the fact of whether or not he has been a defendant in this lawsuit. I think that maybe the defendant Gillaspie didn't understand what he was coming up to, and I don't think—I don't want this jury to be misled by the statements of this person if in fact they would find that he may have had some interest in to discolor the truth. But I'm not going to allow any more of those and—

Leavitt alleges error on the part of the trial court in allowing the question and in refusing to give an instruction cautioning the jury, in determining any liability or damages, not to consider the fact that Cripple Creek Resort, Inc., may have been a defendant in the action. Leavitt argues that the question was, alone, irrelevant to the issues before the jury, and that it was likely to invite improper speculation.

■ We need not decide whether it was proper to allow the question and answer, because Leavitt has not shown that such evidence prejudiced his case or was such as to have influenced the jury to return a verdict for Gillaspie.

*Assumption of Risk.*

The court instructed the jury on Gillaspie's affirmative defense of assumption of risk. Leavitt claims this was error.

The concept of assumption of risk was developed from the common law action of a servant against his master. The master was held to be not negligent if he provided a reasonably safe place to work, and the servant was said to have assumed the inherent risks that remained. In this sense assumption of risk was not an affirmative defense, but rather was another way of

saying the master was not negligent; for the servant had the burden of proving that his injury resulted from a risk other than one inherent in a place that was a reasonably safe place to work.

As the doctrine developed, however, it became an affirmative defense, with the burden of pleading and proof on the master. Thus, even if the servant could show that the master was negligent because he had failed to provide a reasonably safe place to work, the master could escape liability if he could establish that the servant had voluntarily exposed himself to a risk negligently created by the master. As the Supreme Court of New Jersey has pointed out, "Thus two utterly distinct thoughts bore the same label with inevitable confusion." [13]

But the matter did not stop here. The courts came to use the doctrine of assumption of risk, as an affirmative defense, in a way that was different in essence from the defense of contributory negligence. Where contributory negligence was a defense, the question was whether the plaintiff had acted for his own safety as a reasonably prudent man would have acted under the circumstances. But where assumption of risk was a defense, the question was whether plaintiff had voluntarily entered into a situation involving obvious danger, with knowledge of the danger, and without regard to whether he had acted in such a situation as a reasonably prudent man would have acted. The effect of this concept was to exculpate a negligent defendant upon the notion that a plaintiff assumed the risk of that negligence even though he was not contributorily at fault, i. e., even though he had exercised the care of the reasonably prudent man under all the circumstances.[14]

This is the sense in which the doctrine was used by the trial court in this case. The court instructed the jury that Gillaspie would be relieved from liability if he proved that decedent had freely and voluntarily entered into a situation involving danger of personal harm from Gillaspie's conduct, with the knowledge of facts which created the danger and a realization of the risk of harm to decedent from that danger. Such an instruction had the effect of creating the potential of a verdict for Gillaspie, despite the fact that the jury may have found under the issue of contributory negligence that decedent, in the face of the danger of which he had knowledge, still had exercised the care of a reasonably prudent person under all the circumstances. Thus, even though the decedent may have been found to be not contributorily negligent, he would be barred from recovery by reason of assumption of risk.

As a matter of policy we disapprove of a concept which could result in a situation where an accident victim, even though not contributorily at fault, could be barred from recovery because he knew or should have known of a negligently created risk. The just concept should be whether a reasonably prudent man in the exercise of due care would have incurred the risk despite that knowledge, and if so, whether he would have conducted himself in the manner in which the plaintiff acted in the light of all the circumstances, including the appreciated risk.[15] This means that only the traditional notions of negligence and contributory negligence should govern cases such as we have here and that the defense of assumption of risk should not be a defense and should not be used.[16]

13. Meistrich v. Casino Arena Attractions, Inc., 31 N.J. 44, 155 A.2d 90, 93, 82 A.L.R.2d 1208, 1214 (1959).

14. Id., 155 A.2d at 94, 82 A.L.R.2d at 1214–1215.

15. Id., 155 A.2d at 95, 82 A.L.R.2d at 1216.

16. Felgner v. Anderson, 375 Mich. 23, 133 N.W.2d 136, 141–154 (1965); McGrath v. American Cyanamid Co., 41 N.J. 272, 196 A.2d 238 (1963); Zumwalt v. Lindland, 239 Or. 26, 396 P.2d 205, 207 (1964); II F. Harper & F. James, The Law of Torts § 21.8 at 1191–92 (1956).

 If the instruction on assumption of risk had been limited by the notion of what a reasonably prudent man would have done under the circumstances in which decedent found himself, with knowledge of the danger that might have been involved, then such an instruction would have dealt with nothing more than another phase of contributory negligence.[17] But as we have pointed out, the instruction was not so limited. It was entirely possible, under the instructions on contributory negligence and assumption of risk, for the jury to have found that decedent was free from contributory negligence but nevertheless could not recover because he had exposed himself to a negligently created risk, without regard to whether a reasonably prudent man may have done so in the same circumstances. Because of such a possibility and because we disapprove of such a concept, a new trial must be ordered with instructions not to give the jury an instruction on assumption of risk.

*Reduction of Damages to Present Worth.*

The court instructed the jury that if they found for Leavitt, in computing the amount by which decedent's estate had been diminished because of his wrongful death, the jury must determine the present cash value of such amount. In other words, the jury was instructed to reduce damages to present worth. Leavitt admits that since he lost the case on the question of liability, he is in no position to claim any prejudice from the court's instruction. But he asks us, in the event a new trial is ordered, to hold that such an instruction was erroneous and not a correct statement of the law.

 Since the judgment was entered in this case, we decided the case of Beaulieu v. Elliott.[18] There we held that in computing future loss of earnings a reduction should not be made to present worth.[19] The reasoning used there would apply in a wrongful death case where the measure of

damages is the amount by which the decedent's estate had been diminished because of his death. We assume that on a retrial of this case the trial court will take cognizance of the *Beaulieu* case and give appropriate instructions to the jury as to the computation of damages.

*Gillaspie's Appeal*

Gillaspie appeals on two grounds. The first has to do with the permissible scope of his counsel's examination of Gillaspie's witness, Donald Pearson, vice president and manager of Cripple Creek Resort, Inc., the corporation owning the bar where Gillaspie and decedent and others in the party purchased and consumed beer prior to the accident. Pearson testified that he recalled speaking to decedent on the fatal night and that decedent "seemed to be sober enough." Pearson did not recall the state of sobriety of Gillaspie and the others, except to say that if they had been drunk he would have thrown them out.

Gillaspie's counsel was permitted by the court to inquire of Pearson as to whether the corporation had been a defendant in this action, to which question the answer was "yes." Counsel was not permitted, however, to show by further questioning that the corporation had executed a confession of judgment in Leavitt's favor for $100,000 prior to the trial of this action. The court held that evidence as to a confession of judgment was not relevant to the determination of the issue between Leavitt and Gillaspie.

Gillaspie claims this ruling was error. His argument is that the state of decedent's sobriety was a material factor to be considered by the jury in determining whether or not decedent was contributorily negligent, that Pearson's testimony that Leavitt appeared to be sober was adverse to the interest of Gillaspie who stood to gain by showing that decedent was not sober, that Pearson may have been motivated in so

---

17. Meistrich v. Casino Arena Attractions, Inc., 31 N.J. 44, 155 A.2d 90, 95, 82 A.L.R.2d 1208, 1216 (1959).

18. 434 P.2d 665 (Alaska 1967).

19. Id., at 671–672.

testifying by his bias against Gillaspie and in favor of Leavitt, that such bias would be shown by establishing that Pearson's corporation had a financial interest in the case adverse to the interest of Gillaspie, and that such a financial interest would be demonstrated by showing that the corporation had confessed judgment in Leavitt's favor for $100,000. Gillaspie's reasoning in support of his contention that the corporation had a financial interest in the outcome of the dispute between Leavitt and Gillaspie, is that it was in the interest of the corporation that Leavitt obtain judgment against Gillaspie because this would decrease the possibility that Leavitt would seek to collect the full $100,000 judgment from the corporation by reason of its confession of judgment in that amount.

 This is nothing more than speculation. There was no way of knowing to what extent Leavitt would attempt to collect a judgment from the corporation if a judgment had also been rendered against Gillaspie. Evidence as to the corporation's confession of judgment was, as the trial court correctly held, irrelevant as to the issues between Leavitt and Gillaspie. There was no error in excluding such testimony.

Based upon testimony regarding decedent's educational background, grades [20] and character, the court allowed the introduction in evidence by Leavitt of certain charts prepared by Professor Haring, an economist at the University of Alaska, from income figures contained in the 1960 Alaska census. These charts contained statistical data showing the average annual income of males in Alaska in certain age groups, certain areas, and in certain educational levels. Gillaspie claims this was error on the ground that it was so speculative as to decedent's lifetime income expectations as to be useless to the jury.

 The charts introduced in evidence reflected Professor Haring's opinion as to the statistical data contained therein. The criterion for determining whether such an expert opinion is admissible is whether the jury can receive appreciable help from the expert witness on the subject on which he testifies.[21] We believe that the jury could receive such help in this case. In determining the loss to an estate in a wrongful death action, the jury at some point must make an estimate as to the decedent's lifetime income expectations. This must be arrived at largely through probabilities, and any evidence that would reasonably tend to indicate the decedent's earning capacity in the future had he lived would be of assistance to the jury.[22] We believe that Professor Haring's data presented to the jury a reasonable basis for assisting them in estimating the probable future earnings of decedent.[23] The admission of the charts in evidence was not error.

The judgment is reversed and the case remanded for a new trial.

NESBETT, Chief Justice (concurring and dissenting).

I concur in the result. It is my opinion that the court erred in giving an instruction on assumption of risk because there was no evidence that Leavitt comprehended the dangers. In Evans v. Buchner [1] this court said:

The general rule is that the defense of assumption of risk is not applicable unless the facts which create a dangerous condition or situation are known and the danger itself comprehended by the person against whom the defense is being exerted.

In *Buchner* the court adopted a subjective test. The question in each case was to be

---

20. Decedent was a student at the University of Alaska at the time of his death.

21. Pedersen v. State, 420 P.2d 327, 335 (Alaska 1966); Crawford v. Rogers, 406 P.2d 189, 192 (Alaska 1965).

22. See Turrietta v. Wyche, 54 N.M. 5, 212 P.2d 1041, 1047, 15 A.L.R.2d 407 (1949).

23. Krohmer v. Dahl, 145 Mont. 491, 402 P.2d 979, 981–982 (1965).

1. 386 P.2d 836, 837 (Alaska 1963) (footnote omitted).

whether the plaintiff had a knowledge of the facts and an actual comprehension of the danger. Under *Buchner* it would not be enough to invoke the doctrine of assumption of risk to argue that Leavitt must have had an awareness of the fact that Gillaspie had drunk a lot of beer; that his judgment may have been impaired; that it was dangerous to ride with him and that because he did ride with Gillaspie he comprehended the danger and elected to assume the risk.[2]

Although I concur in the result reached by the majority I do not agree that the defense of assumption of risk should be entirely abolished. Whether the doctrine is entitled assumption of risk or given an appropriate label as a variation of the doctrine of contributory negligence, I believe that it has a place in our jurisprudence in some factual situations.

As was aptly stated by the Supreme Court of California in Prescott v. Ralph's Grocery Co.[3]:

The defenses of assumption of risk and contributory negligence are based on different theories. Contributory negligence arises from a lack of due care. The defense of assumption of risk, on the other hand, will negative liability regardless of the fact that plaintiff may have acted with due care. (See Prosser on Torts [1941], p. 377.) It is available when there has been a voluntary acceptance of a risk and such acceptance, whether express or implied, has been made *with knowledge and appreciation of the risk.* (See Rest., Torts, § 893).

Assumption of risk has been abolished as a defense in the master servant relationship in Alaska, as it has in many other states.[4] It has also been abolished in many states in automobile guest statutes. It appears that the defense has been entirely abolished in at least three states.[5] Although some of the legal aspects of the defense may duplicate those of contributory negligence in some factual situations, this is not generally so where there has been a voluntary acceptance of a *comprehended risk.*[6] It is significant that in the cases cited in the preceding note, two of which are relied on by the majority, the plaintiff in Bolduc v. Crain had no appreciation whatever of the unusual risk involved in attempting to assist the handler of a particularly "lively" team of horses; that in Felgner v. Anderson there was, as far as can be learned from the opinion, no evidence that plaintiff had an appreciation of any danger involved in hunting ducks out of the same blind as defendant; and that in Meistrich v. Casino the only evidence that plaintiff had an appreciation of the danger involved in skating on arena ice which defendant operator had frozen so hard that it became slippery, was that he "noted that his skates slipped on turns". The requirement that there be evidence showing a comprehension of the danger involved would, in my opinion, have made the defense of assumption of risk in

---

2. The subjective test adopted by Buchner is the rule in the majority of jurisdictions. See Guerrero v. Westgate, 164 Cal.App.2d 612, 331 P.2d 107, 110 (1958); Prescott v. Ralph's Grocery Co., 42 Cal. 2d 158, 265 P.2d 904, 905–906 (1954); Dean v. Martz, 329 S.W.2d 371, 374 (Ken.1959); Evans v. Johns Hopkins Univ., 224 Md. 234, 167 A.2d 591, 594 (1961); Fitzpatrick v. Marastoni, 234 Or. 192, 379 P.2d 1022, 1023 (1963); Shoemaker v. Floor, 117 Utah 434, 217 P.2d 382, 387 (1950); Kingwell v. Hart, 45 Wash.2d 401, 275 P.2d 431, 434–435 (1954); Restatement of Torts § 893 (1939); Restatement (Second) of Torts §§ 496 A–G (1965).

3. 42 Cal.2d 158, 265 P.2d 904, 906 (1954) (emphasis added).

4. AS 23.30.055, 23.30.080.

5. Felgner v. Anderson, 375 Mich. 23, 133 N.W.2d 136, 141–154 (1965) (except in employment relationships and where there has been an express contractual assumption of risk.); Bolduc v. Crain, 104 N.H. 163, 181 A.2d 641, 644 (1962); Meistrich v. Casino Arena Attractions, Inc., 31 N.J. 44, 155 A.2d 90, 95, 82 A.L.R.2d 1208 (1959).

6. See W. Prosser, The Law of Torts § 67 (3d ed. 1964).

the foregoing cases inapplicable in Alaska and in other jurisdictions requiring an actual comprehension of the danger.

Section 893 of the *Restatement of Torts* contains numerous factual illustrations of where the doctrine of voluntary acceptance of a comprehended danger has logical application. One example is Hunt v. Portland Baseball Club [7] where the court held that a spectator could not recover from the ball club for injuries received when struck by a foul ball because he was intimately familiar with the game of baseball and the risks inherent in being a spectator and had knowingly placed himself in an area of appreciated risk.[8]

Under the majority holding, even though the evidence may show a voluntary acceptance of an appreciated risk, the question would be

> whether a reasonably prudent man in the exercise of due care would have incurred the risk despite that [actual] knowledge, and if so, whether he would have conducted himself in the manner in which the plaintiff acted in the light of all the circumstances, including the appreciated risk.

The new doctrine is intended to simplify and clarify the law of negligence and eliminate incompatible defenses by subsuming assumption of risk under contributory negligence, but I doubt if this will be the ultimate effect. If the new test were applied to the facts of the Oregon baseball case just mentioned, the jury would be asked to determine first whether a reasonably prudent person in the exercise of due care would have purchased a seat not behind a screen even though he comprehended the danger. The evidence would ordinarily have established that seats behind a screen

were available and that management could have made the balance of the seats safer by screening,[9] but at the expense of visibility. The jury would be aware of the fact that hundreds of thousands of baseball, hockey and other sports fans daily and knowingly sit in areas of danger as spectators. If the jury conscientiously applied the objective test of the average man, and based its judgment on what it knew the average man was doing daily throughout the country, it might very well conclude that the spectator had acted with "due care" in purchasing a ticket for an unprotected seat, even though he knew there was a danger that he might be injured while occupying the seat.

What appears to be an unrealistic aspect of the new test is at once apparent. Why should any controlling effect be given to the question of whether a reasonably prudent man would have incurred the comprehended risk if the evidence has established that the particular plaintiff did in fact voluntarily incur the comprehended risk? How can it be logically said that a person has acted with "due care" when it has become apparent from the evidence that he deliberately and knowingly chose to place himself in a position of danger? If the jury should find that the spectator had not acted with due care, in spite of the fact that a large segment of the population daily engaged in identical conduct, can it be said that the objective test of the average, or reasonably prudent man, has been realistically applied?

If the jury finds that the plaintiff spectator has acted with due care, the next question it would be asked to decide under the new test would be whether he

> would have conducted himself in the manner in which the plaintiff acted in

---

7. 207 Or. 337, 296 P.2d 495, 498–503 (1956).

8. Footnote 13 of the majority opinion cites the Oregon case of Zumwalt v. Lindland, 239 Or. 26, 396 P.2d 205, 207 (1964), as authority for the complete abolition of the doctrine of assumption of risk, but since the Oregon automobile

guest statute was involved it would appear that the case has a limited application.

9. In which case the jury would experience little difficulty in finding management negligent, particularly if there was insurance in the background.

the light of all the circumstances, including the appreciated risk.

This aspect of the test must mean that the jury must next decide whether the spectator, after having knowingly and without negligence placed himself in an area of danger, thereafter conducted himself in such a manner as not to increase the danger to himself. In other words, was he contributorily negligent after having taken his seat? Judging by the wording of the new test, this question would be asked in every case where the jury had found initially that the spectator was not negligent in purchasing an unprotected seat, even though no evidence may have been introduced during the trial which would tend to show that he had done anything to increase the existing danger. In my opinion, it is unrealistic to ask a jury to determine the answer to a question which has no factual basis in the evidence. For example, if the evidence showed that the spectator had merely occupied his seat until he was hit in the head by a foul ball, the judge would be obligated, it would seem, to set aside a verdict for the defendant management because of lack of any evidence that the spectator had done anything to increase the risk of injury. The question might be appropriate if there was evidence that the spectator had remained seated in a fixed posture until struck by the ball when he could have avoided being struck by ducking to one side or the other, or downward, or perhaps could have even caught the ball in his hands. Evasive or protective action of this sort is regularly employed by the average fan who must, at times, be an athlete of sorts himself in order to exercise the judgment and agility necessary to avoid injury.

The foregoing discussion demonstrates, in my opinion, the impracticability of attempting to determine the usual assumption of risk situation by the rules of negligence. For other examples see a discussion with illustrations in Restatement of Torts § 893 (1939).