Heather HIIBSCHMAN, By and Through her guardian, Debra WELCH, and Debra Welch, Appellants and Cross–Appellees,

v.

CITY OF VALDEZ and Valdez Office Building, Inc., d/b/a Valdez Bottle Stop Liquor Store, Appellees and Cross–Appellants.

Nos. S–3678, S–3679.

Supreme Court of Alaska.

Dec. 6, 1991.

Roger W. DuBrock, Law Office of Roger W. DuBrock, Anchorage, for appellants and cross-appellees.

Donna P. Walker, James M. Seedorf, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage for appellee and cross-appellant, City of Valdez.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON, and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

### INTRODUCTION

Heather Hiibschman sued the City of Valdez in tort for injuries incurred as she went over a ski bump-jump at a city ski hill. The superior court granted part of the City's summary judgment motion and let part of Hiibschman's case go to the jury, which found against her. She appeals and the City cross-appeals, both primarily questioning the interpretation of Alaska's 1980 Limitations on Claims Arising From Skiing Act ("Ski Act"), AS 09.65.135.[1]

---

1. Limitations on claims arising from skiing.

(a) A skier may not recover from a ski area operator for injury resulting from an inherent risk of skiing unless the injury occurred when the ski area operator was not providing the information required by (b) of this section.
(b) A ski area operator shall post trail signs at prominent locations within a ski area which shall include a list of the inherent risks of skiing and the limitation on liability of the ski area operator provided by this section.
(c) In this section

(1) "inherent risks of skiing" means the dangers or conditions which are an integral part of the sport of skiing, including, but not limited to,
(A) changing weather conditions;
(B) variations or steepness in terrain;
(C) snow or ice conditions;
(D) surface or subsurface conditions such as bare spots, forest growth, and rocks;
(E) collisions with lift towers, other structures, and their components unless the skier is on the lift;
(F) collisions with other skiers; and

STATEMENT OF FACTS

Salmonberry Ridge, the only downhill ski facility in Valdez, opened to the public in January 1986. It is considered a beginner's hill, measuring 1,300 feet from top to bottom with a 208 foot vertical rise. From the base of the hill, one can view almost the entire hill.

Several bump-jumps could be found on the hill at the time of Hiibschman's accident.[2] The jump at issue was located at the lower left side of the hill if one looked at the hill from its bottom. The jump was located on a relatively flat area of the hill, although there was a steeper area just uphill of the jump. The jump was estimated to be from two feet to four feet in height. It was the only jump in that area of the hill and was a "focal point" of the run on that side of the hill.

On March 13, 1986, Heather Hiibschman, a fifteen year old, went skiing at Salmonberry Ridge. Hiibschman was a beginner skier. She had gone downhill skiing approximately six to ten times prior to the accident, although she had also cross-country skied. Prior to March 13, Hiibschman had been skiing at Salmonberry every day of the week.

Hiibschman had never taken the jump in question. She said, "Most of the time I just didn't feel like I was ready ... I couldn't find anybody who would teach me, show me how to do it, and I wanted to be shown how to do it before I went and just tried it myself." The day of her accident, she decided to try the jump. Hiibschman watched at least four of her friends take the jump. While they were slightly more advanced than Hiibschman, she also observed people of her ability level go off the jump. Her friend Aaron Kelly specifically showed her how to ski the jump. He advised her, "stay down, stay forward." Hiibschman stated that she felt fairly familiar with the approach and the takeoff, gaining that familiarity from watching people as she skied beside them, looking at the jump, and reading ski magazines to learn what she was supposed to do.

Hiibschman stood in line to take this jump. As she approached the jump, she concentrated on what she was doing. Hiibschman states that she snowplowed all the way to keep her speed as low as possible and that she was going slower than the skiers on the other side of the hill. As she approached the jump, she leaned forward. She also straightened out her skis so they would not cross when she hit the jump.[3] However, Hiibschman stated, the jump

> threw me way high, higher than I thought it would, and threw me back. And I was—still upside down in the air, and I was struggling to get forward, lean forward as hard as I could and I just didn't have enough time. My butt and the backs of my skis hit the ground at about the same time and then I rolled down the hill—slid actually.

Others confirmed that the jump "lofted you straight up into the air...." Hiibschman testified that when she landed, her skis "were almost perpendicular to the ground." She fell and landed on her tail bone, resulting in permanent paralysis from the waist down.

At the time Hiibschman jumped, a big pit existed at the base of the jump, where

(G) a skier's failure to ski within the limits of the skier's ability;
(2) "injury" means a personal injury or property damage or loss;
(3) "skier" means a person in a ski area engaged in the sport of skiing, sliding downhill on snow or ice on skis, a toboggan, a sled, a tube, a ski-bob, or other device for recreation in snow;
(4) "ski area" means all ski slopes, trails and other places under the control of a ski area operator and administered as a single enterprise in the state;
(5) "ski area operator" means the operator of a ski area.

2. While the City contends that this was more of a "bump" than a "jump," the term "jump" will be used. We draw the inferences in Hiibschman's favor, as she was the party opposing summary judgment. *Wilson v. Pollet*, 416 P.2d 381, 383–84 (Alaska 1966).

3. Others dispute Hiibschman's account. Some say that she was traveling quickly, approaching the jump at "full speed," becoming rigid as she neared the jump, and leaning too far back which caused her ski tips to go straight up. Again, we construe the facts in Hiibschman's favor at this stage.

people had been landing. The ski lift operator explained, "[A]t the end of the day you have this pit right here, this is an average distance where everybody's going to land, and they always fall and hit their butts on the snow and it just keeps digging it out and digging it out." Hiibschman never observed the landing area nor did anyone mention to her anything about it. The lift operator further explained, "as you landed it was kind of a flat surface, not too much incline so you had ... a hard landing ... because if you have an incline it tends to be more soft because you glide off it, but instead you kind of landed hard, boom, you know." Another lift attendant also said the jump was dangerous because the landing was too flat and a skier would get too much air time for the jump. About half the people taking the jump fell, some of whom were beginners.[4] Some skiers who fell also landed on their rear or back.

During testimony, when asked whether he thought the jump was dangerous, the ski lift operator answered, "Yes." He admitted that "I should have told them not to take the jump until they had learned how to ski better, because they kept getting behind on their skis...."[5] However, while the ski patrol would destroy jumps it considered unsafe or mark them as out of bounds, this jump was not so destroyed or marked. An expert in ski area design and

planning thought it was inappropriate to have this jump, or any jump, on a beginner's hill unless the jump were marked as appropriate only for more advanced skiers.

One other key fact exists regarding the accident. Before skiing, Hiibschman and her friends stopped at the Valdez Bottle Stop Liquor Store. Hiibschman estimated that she had consumed between one and one-half and three beers before the accident. She believed that she was in control at all times while skiing and that the beers made no difference to her skiing performance. Hiibschman asserted that she had taken four runs between her last drink of beer and the time of the accident and she did not fall on any of those runs. She said she was clear headed as she started her descent towards the jump. An emergency medical technician who subsequently attended Hiibschman stated, "I could smell alcohol on her breath, but she was not obviously intoxicated."

On the day of Hiibschman's accident, there were at least five inherent risk of skiing signs posted at Salmonberry Ridge: one on the outside of the lift shack, one by the door to the warming hut, one inside the warming hut, and one on the inside of each bathroom door.[6] These signs were posted in places the Parks & Recreation Service thought were "the most prominent places on the ski hill."

---

**4.** The testimony varied widely on the success rate for navigating the jump. Some testimony indicated that hardly any of the skiers navigated it successfully and even intermediate skiers would fall. Yet, others said most skiers navigated this jump successfully.

**5.** The head of the ski patrol at the time of the accident stated, however, that to his knowledge, no other skier had ever been injured on that jump. The ski lift operator concurred.

**6.** The signs read as follows:
INHERENT RISKS OF SKIING
AS REQUIRED BY ALASKA STATE STATU[T]E SEC. 09.65.135, THIS NOTICE IS TO INFORM YOU OF THE INHERENT RISKS OF SKIING. INHERENT RISKS OF SKIING MEANS DANGEROUS CONDITIONS WHICH ARE AN INTEGRAL PART OF THE SPORT

OF SKIING. THESE RISKS INCLUDE BUT ARE NOT LIMITED TO:
    A.  CHANGING WEATHER CONDITIONS;
    B.  VARIATIONS OR STEEPNESS IN TERRAIN;
    C.  SNOW OR ICE CONDITIONS;
    D.  SURFACE OR SUBSURFACE CONDITIONS SUCH AS BARE SPOTS, FOREST GROWTH, AND ROCKS;
    E.  COLLISIONS WITH LIFT TOWERS, OTHER STRUCTURES, AND THEIR COMPON[ ]ENTS UNLESS THE SKIER IS ON THE LIFT;
    F.  COLLISIONS WITH OTHER SKIERS;
    G.  A SKIER'S FAILURE TO SKI WITHIN THE LIMITS OF THE SKIERS ABILITY.
LIMITATION ON CLAIMS ARISING FROM SKIING
A SKIER MAY NOT RECOVER FROM A SKI AREA OPERATOR FOR INJURY RESULTING FROM AN INHERENT RISK OF SKIING.

Based on the Ski Act, the City moved for summary judgment, which the superior court granted in part and denied in part. The court held that Hiibschman's injuries resulted from "an inherent risk of skiing" which specifically included "variations or steepness in terrain," "surface ... conditions," and/or "a skier's failure to ski within the limits of the skier's ability." The superior court rejected Hiibschman's contention that the statute's categories violated equal protection. However, the superior court found that a genuine issue of material fact existed regarding whether the signs were posted "at prominent locations within [the] ski area...."

Hiibschman filed a motion for reconsideration. While the court concluded that artificial objects can qualify as an inherent risk of skiing within the statute, the court agreed with Hiibschman that negligent or defectively made or designed artificial conditions would not constitute an "inherent risk of skiing" and could be actionable in tort. However, the superior court stated that no competent evidence was presented to raise a genuine issue of material fact that the jump was negligently or defectively made or designed. The court also found it unnecessary to consider whether the slope was negligently maintained, instead treating the claim as one of negligent design.

Hiibschman then filed a second motion for reconsideration which the superior court granted in part, and denied in part. The court considered an expert affidavit stating that allowing a jump on a beginner hill was negligent and found that it raised a genuine issue of material fact as to whether the jump constituted an inherent risk of skiing. However, the court reaffirmed its prior conclusion that Hiibschman's attempt to ski over the jump was, as a matter of law, "a skier's failure to ski within the limits of the skier's ability." Thereafter the court submitted the issue of adequate signing to a jury. The jury re-

turned a verdict in favor of the City on this issue. Hiibschman now appeals and the City cross-appeals.

## I. DID THE JUMP CONSTITUTE AN INHERENT RISK OF SKIING OR A NEGLIGENTLY CREATED ARTIFICIAL CONDITION?

■ The superior court found that a genuine issue of material fact existed as to whether the jump constituted an inherent risk of skiing, i.e. whether the jump was a non-negligently created or maintained variation in terrain. The City, in its cross-appeal, is asking the court to hold, as a matter of law, that the jump constituted an inherent risk of skiing.[7] The City contends that the jump was a "variation[ ] or steepness in terrain" or a "surface condition[ ]." The City also asserts that the jump was open and obvious and knowingly encountered, and argues that Hiibschman's alcohol consumption magnified any risk inherent in the jump. It claims the greater weight of authority would deem the jump an inherent risk of skiing.

Hiibschman maintains that the jump was an artificial condition created by a neglected stack of brush cut and stacked by the City. Alternatively, she submits that it may have been built by children with shovels borrowed from the City employees, and intentionally groomed by the employees. Her theory of negligence is that this jump was inappropriate for a beginners' hill, particularly as no warning of its danger was given.

We affirm the superior court's determination that a genuine issue of material fact existed as to whether the jump constituted an inherent risk of skiing.

### A. *Evidence of Negligence*

First, we note that the statute does not eliminate a ski area operator's liability for negligence. The legislative history of the statute makes this clear. Industry proponents of the bill stated repeatedly that they

PLEASE BE SAFETY CONSCIOUS AND HAVE A GOOD TIME.

7. The superior court's grant of summary judgment is reviewed as to whether a genuine issue of material fact exists and whether the moving

party is entitled to judgment on the law applicable to the established facts. *Sea Lion Corp. v. Air Logistics of Alaska Inc.,* 787 P.2d 109, 116 (Alaska 1990). All legal questions are afforded *de novo* review. *See Walsh v. Emerick,* 611 P.2d 28, 30 (Alaska 1980).

did not wish to avoid any responsibilities that were rightfully theirs, but they wanted to reduce nuisance claims. The statute was intended to bar recovery for those actions which only the skier could control and that were beyond the ski area operator's control. That the legislature intended to "clarify" the law and not change it, and that it sought to limit recovery for "inherent risks," reinforces our conclusion that industry liability for negligence was maintained.[8]

Therefore, the Ski Act preserved the common law duties of ski area operators at the time of the act's passage. In *Webb v. City and Borough of Sitka*, we said,

> The rule that we adopt is this: A landowner ... must act as a reasonable person in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden on the respective parties of avoiding the risk.[9]

561 P.2d 731, 733 (Alaska 1977).

■ Further, at the relevant time the law on assumption of risk had been clarified, restricting it as an affirmative defense, but leaving intact the concept in its "no duty" form. We explained,

> The concept of assumption of risk was developed from the common law action of a servant against his master. The master was held to be not negligent if he provided a reasonably safe place to work, and the servant was said to have assumed the inherent risks that remained.

In this sense assumption of risk was not an affirmative defense, but rather was another way of saying the master was not negligent; for the servant had the burden of proving that his injury resulted from a risk other than one inherent in a place that was a reasonably safe place to work.

*Leavitt v. Gillaspie*, 443 P.2d 61, 67–8 (Alaska 1968). We continued,

> But where assumption of risk was a defense, the question was whether plaintiff had voluntarily entered into a situation involving obvious danger, with knowledge of the danger, and without regard to whether he had acted in such a situation as a reasonably prudent man would have acted....
>
> As a matter of policy we disapprove of a concept which could result in a situation where an accident victim, even though not contributorily at fault, could be barred from recovery because he knew or should have known of a negligently created risk. The just concept should be whether a reasonably prudent man in the exercise of due care would have incurred the risk despite that knowledge, and if so, whether he would have conducted himself in the manner in which the plaintiff acted in the light of all the circumstances, including the appreciated risk.

*Id.* Consequently, only the person who voluntarily and unreasonably assumed a negligently created risk was contributorily negligent and barred from recovery. *Hale v. O'Neill*, 492 P.2d 101, 103 (Alaska 1971); *Young v. State*, 491 P.2d 122, 125 (Alaska

---

8. The statement of legislative intent reads as follows:

The legislature finds that the sport of skiing is practiced by a large number of residents of the state and attracts a large number of nonresidents, significantly contributing to the economy of the state. It further finds that insurance carriers are increasingly reluctant to provide liability insurance protection to ski area operators and that the premiums charged by insurance carriers have risen sharply in recent years due to confusion as to whether a skier assumes the risks inherent in the sport of skiing when he participates actively in the sport. It is the intent of the legislature in enacting this Act to clarify the law in relation to skiing injuries and the risks inherent in that sport and to provide that, as a matter of public policy, a person engaged in that sport may not recover from a ski area operator for injuries resulting from those inherent risks.
Ch. 80, § 1, SLA 1980.

9. When AS 09.65.135 was passed in 1980, ski area operators were also under a statutory duty to avoid liability for negligence. Former AS 05.20.012, enacted in 1967, read:

Liability For Accidents In Skiing Areas. No owner or operator of ski equipment may be held liable for the negligence of persons other than employees who use designated skiing areas owned or controlled by him, *unless the owner or operator has negligently maintained the designated skiing areas* or has furnished or supplied defective equipment, the use of which is the proximate cause of any injury

1971); *Bachner v. Pearson,* 479 P.2d 319, 328–330 (Alaska 1970).[10]

■ While we believe the statute codified this case law in the ski context, it also aids trial courts by listing those risks which are considered inherent in the sport: those risks which are obvious[11] and necessary[12] to it. Evidence of negligence on the part of the ski area operators, however, takes the case out of the inherent risk of skiing context.

In the case at bar, it is not clear that the condition was an inherent risk of skiing, given that a jump is not specifically listed in the statute and its risk is not necessarily obvious or necessary.[13] Hiibschman stated she didn't think the jump was hazardous in the way it was designed or constructed before she went off of it. She said, "I didn't think it would be there if it was." She knew that the ski hill staff allowed children to take the jump and therefore assumed it was safe for beginners.

Our review of the record persuades us that evidence of negligence also exists in the case at bar. For example, one witness stated that the jump should be torn down because "it wasn't fit, suitable ... because it was built to where you got too much air, and it was a flat landing." Hiibschman's expert witness stated that there should not have been any jumps at all on a beginner's slope and that if the ski area were intended for more than beginner skiers, the jumps should have been clearly marked as being suitable only for expert skiers. Others also testified that the jump was not safe for beginner skiers. In fact, the ski area had rules prohibiting artificial jumps, unless authorized by ski area management. With all inferences drawn in Hiibschman's favor, we conclude that genuine issues of material fact exist as to whether the jump was an inherent risk of skiing.

### B. *Artificial versus Natural Conditions*

Hiibschman makes much of this distinction in her brief; the City, however, contends it is irrelevant to the legal question of whether the jump was a "variation[ ] or steepness in terrain," or a "surface ... condition[ ]." The City maintains the origin of the jump is irrelevant, as it is an inherent risk of skiing even if it was an artificial condition.

An artificial item can produce an inherent risk of skiing. The statute covers, for example, collisions with lift towers. AS 09.65.135(c)(1)(E). Other artificial items may also produce inherent risks assuming they are not negligently designed or maintained or assuming the risk is obvious and necessary (e.g. moguls on an expert trail).[14]

---

sustained by a person while engaged in skiing activities within the designated skiing areas. [§ 2 Ch. 25 SLA 1967] (Emphasis added).

10. Given the law of assumption of risk codified by the statute, we reject the City's argument that assumption of risk bars Hiibschman's claim on the basis that the jump was open and obvious and knowingly encountered. Similarly, the City cites cases indicating that the assumption of risk doctrine codified by statute "renders the reasonableness of the skier's ... behavior irrelevant." *E.g., Schmitz v. Cannonsburg Skiing Corp.,* 170 Mich.App. 692, 428 N.W.2d 742, 744 (1988). We reject this interpretation.

11. The frequent notice provided by trail signs makes the risk obvious.

12. A risk must be "necessary" to be an inherent risk of the sport.
   The question of whether a risk is necessary relates to the issue of the operator's duty; .... If a given danger could be eliminated or mitigated through the exercise of reasonable care, it is not a necessary danger. Necessary dangers, therefore, must be those which cannot *reasonably* be eliminated by the area operator.
   *Assumption of Risk After Sunday v. Stratton Corp.: The Vermont Sports Injury Liability Statute and Injured Skiers,* 3 Vermont L.Rev. 129, 141–2 (1978) (emphasis in original).

13. A risk not listed in the statute may still be an inherent risk of the sport if necessary and obvious. The risk must be subjectively obvious to the skier. The plaintiff must know of the risk's presence, understand its nature, and freely and voluntarily choose to encounter it. W. Keeton, *Prosser & Keeton on Torts,* § 68, at 486–87 (5th ed. 1984).

14. If, as the City contends, moguls originate from "terrain variations, skier patterns, and snow and ice conditions," then they are not artificial conditions intentionally put on the run comparable to the jump.

*See Rowett v. Kelly Canyon Ski Hill, Inc.,* 102 Idaho 708, 639 P.2d 6, 7 (1981) (no negligence by ski area operator when night skier injured by skiing into traffic control device which was adequately illuminated and discernible at a distance); *see also Smith v. Seven Springs Farm, Inc.,* 716 F.2d 1002, 1009 (3rd Cir.1983) (advanced intermediate skier voluntarily assumed the risk when he skied down a trail marked most difficult, aware of an icy headwall lined by an unprotected telephone-like pole).

Therefore, we hold that the duty owed to a skier for a natural or an artificial condition is governed by *Webb,* 561 P.2d 731 (faulty sidewalk) and *Moloso v. State,* 644 P.2d 205 (Alaska 1982) (rock slide during state highway project). Primarily, the origin of the danger figures into the *Webb* calculus, as it affects the burden on the respective parties of avoiding the risk. It is also relevant to the issue of the ski resort's knowledge of the danger.

■ We also hold, however, that an artificially created jump can not be, as matter of law, "variations or steepness in terrain" or "surface ... conditions." AS 09.-65.135(a)(1)(B) or (D). While the statute does not differentiate explicitly between a ski operator's responsibility for artificial versus natural conditions, the items it lists, as well as the intent to retain liability for negligence, indicate that ski area operator protection from liability for artificial conditions should be construed narrowly. The legislative history explained, "The intent of this legislation is to clarify the law concerning the *natural, inescapable* risks that are a part of the sport of skiing and to specify that a ski area operator is not liable for injuries resulting from these inherent risks." (Emphasis added).

We find particularly compelling the testimony provided by the National Ski Patrol System, Inc. during the bill's consideration:

We agree with the concept of S.B. No. 470 which addresses the risks inherent in the sport of skiing. Ski area operators in the state definitely need protection from unjustified liability insurance claims associated with the *natural* risks of the sport. At the same time, we are concerned that skiers must also be adequately protected against any form of negligence caused by ski area operators. We believe with a few modifications, the proposed statute can achieve equitable protection for both ski area operators and the using public.

Suggested revisions to sec. 09.10.320 *definitions* are:

. . . .

2. (D). Eliminate the word "stumps". These are probably man induced obstacles that should be either eliminated, reduced, or marked as hazards by the ski area operator.

(Emphasis added). The recommendation to eliminate the word "stumps" was adopted, indicating that altering natural conditions (e.g. cutting a tree) removes them from the category of inherent risks which are explicitly listed by the statute. Our conclusion is reinforced by the presence of the word "stumps" in the Utah ski statute, upon which the Alaska statute is modeled. UCA § 78–27–52(1). Similarly, the National Ski Patrol System, Inc. recommended the following, which was not adopted:

1. (C) Expand on snow or ice conditions to clarify that variations may occur because of weather factors and/or hill grooming.

For instance, standard grooming practices could cause variable snow surface conditions which skiers should accept as normal inherent risks on a managed ski run. Negligent grooming practices could cause unsafe conditions, such as leaving dangerous berms or cutbanks on groomed runs. Ski area operators should not be absolved from such negligence.

That the statute did not include snow variations from hill grooming as an inherent risk also reinforces the importance of this dichotomy.

Case law from other jurisdictions also emphasizes the importance of "natural conditions."

What the challenged statute does is to recognize that there are certain risks in-

herent in the sport of skiing that neither the skier nor the ski area operator can reasonably control. Indeed, the risk and often-rugged *natural* setting provides both the greatest attractions of skiing as well as the greatest elements of danger. *Natural conditions*, such as vegetation, snow cover and weather conditions, make trail conditions highly variable and difficult to manage.

*Kelleher v. Big Sky of Montana*, 642 F.Supp. 1128, 1130 (D.Mont.1986) (emphasis added). Other cases identifying the "inherent risks of skiing" often speak generally of items such as "grade, boundary, mid-trail obstructions, corners and varied conditions of the snow." *Wright v. Mt. Mansfield Lift, Inc.*, 96 F.Supp. 786, 790 (D.Vt. 1951). This includes things such as roots, rocks, brush, ruts, and worn spots. *Id.* In *Leopold v. Okemo Mountain Inc.*, the court spoke of the "apparent and necessary danger" inhering in "trees, rocks and adverse terrain which border every trail." 420 F.Supp. 781, 787 n. 2 (D.Vt.1976).

Here, conflicting evidence exists as to whether this jump was artificially made or naturally part of the terrain. This presents a factual question for jury resolution. The ski lift operator believed the jump was artificial because after it was removed, no dirt, alders or rocks were left. He saw just leveled snow, "nice clean snow." Nor was there newly moved brush around to indicate that it was formed by brush. Also, he had observed the hill prior to the snowfall and others had told him that the jump was an artificial structure. Some operators called the jump "Chet's jump," allegedly after the individual who built it. One witness testified that he saw Chet and another person build these jumps. Supposedly, each day, the employees would throw more snow on the jump to keep it built up, and would groom it or pack snow on it to change its characteristics. Testimony was presented that children made and groomed the jumps with the shovels given to them by employees at the hill. Yet, there was also evidence that it was not a jump, but rather a bump that was used as a jump. The person who removed the jump said it was created by alder.

It remains for the jury to determine whether the jump is a natural variation in terrain or surface condition. Thus, we conclude that the superior court's denial of summary judgment in this respect was correct.

## II. WAS HIIBSCHMAN'S INJURY A RESULT OF A FAILURE TO SKI WITHIN HER ABILITY WITHIN THE MEANING OF AS 09.65.-135(c)(1)(G)?

■ The superior court concluded as a matter of law that at the time of the accident Hiibschman was skiing beyond her ability, within the meaning of AS 09.65.-135(c)(1)(G). Hiibschman argues that the trial court's reasoning produces absurd results, assumes the legislature intended to change tort liability, and is contrary to public policy. The City emphasizes that Hiibschman knew from personal observation what the jump entailed and knowingly assumed the risk. It argues that Hiibschman's alcohol consumption magnified any risk inherent in the jump.

The ski area operator is not liable for injuries resulting from inherent risks listed by the statute, including skiing beyond one's ability. A trial court should grant summary judgment only if no genuine issue of material fact exists. *Sea Lion Corp. v. Air Logistics of Alaska, Inc.*, 787 P.2d at 116 (Alaska 1990). Here, a disputed issue of fact exists as to whether Hiibschman was skiing beyond her ability. We hold that the trial court erred in not submitting this issue to the jury.

■ For "skiing beyond one's ability" to bar an action, the skier must subjectively know he or she is skiing beyond his or her ability, as an inherent risk of skiing must be necessary and subjectively obvious. On knowledge of risk, Prosser states,

[H]e must not only know of the facts which create the danger, but he must comprehend and appreciate the nature of the danger itself.... *The standard to be applied is, in theory at least, a subjective one*, geared to the particular plaintiff and his situation, rather than

that of the reasonable man of ordinary prudence who appears in contributory negligence. If because of age or lack of information or experience, he does not comprehend the risk involved in a known situation, he will not be taken to consent to assume it. His failure to exercise ordinary care to discover the danger is not properly a matter of assumption of risk but of the defense of contributory negligence.

At the same time ... the plaintiff will not be heard to say that he did not comprehend a risk which must have been quite clear and obvious to him.

Keeton, *supra,* at 487–88 (footnotes omitted and emphasis added); *see also Rutter v. Northeastern Beaver County School Dist.,* 496 Pa. 590, 437 A.2d 1198, 1204 (1981).

Viewing the evidence most favorably to Hiibschman, we find that skiing this jump was within her ability level. The jump was located on a beginners' slope. The ski lift operator described Salmonberry Ridge as "very beginner, very slow. There is no difficulty to the run." Hiibschman had taken some down-hill ski lessons before, and had evaluated how to take this jump. Hiibschman watched beginners taking the jump, some mastering it. Others who mastered it, like Aaron Kelly, had fallen the first three times he jumped it. She did not notice anything dangerous about the way the jump was designed or constructed. Although Hiibschman was drinking, she said it did not affect her that day. Moreover, evidence was presented that teenagers and beginner skiers are not as able to accurately assess a degree of risk presented by a dangerous condition. Because contrary evidence was presented,[15] a contested issue of material fact exists. The question of whether Hiibschman was skiing beyond her ability should have gone to the jury.

## III. IS A CLAIM BARRED IF THE INJURY WAS CAUSED BOTH BY AN INHERENT RISK AND THE SKI AREA OPERATOR'S NEGLIGENCE?

As the statute does not insulate a ski area operator from liability for negligence, once evidence of negligence exists, the case must go to the jury. However, the ski area operator is free to argue that the skier voluntarily and unreasonably assumed a negligently created risk.[16] The skier's negligence would then reduce recovery under the doctrine of comparative negligence.

In 1986, six years after the most recent inherent risk of skiing statute was passed (Ch. 80, SLA 1980), our legislature enacted a comparative negligence statute.[17] While we generally give preference to a specific statute over a more general one, *City of Cordova v. Medicaid Rate Comm'n,* 789 P.2d 346, 352 (Alaska 1990), we must harmonize the two statutes if possible. *State, Dept. of Highways v. Green,* 586 P.2d 595, 602 (Alaska 1978).

Ordinarily, an unambiguous statute is enforced as written without judicial construction or modification; however, this rule is not controlling when a seemingly unambiguous statute must be considered in conjunction with another act. *Hafling v. Inlandboatmen's Union,* 585 P.2d 870, 872 (Alaska 1978). In that case, we will examine the legislative history and adopt a reasonable construction which realizes legislative intent, avoids conflict or inconsistency, and gives effect to every provision of both acts. *Id.* at 873, 875, 877.

*Lake v. Construction Mach., Inc.,* 787 P.2d 1027, 1030 (Alaska 1990).

15. For example, Hiibschman's mother told Chet Simmons that the accident was Hiibschman's own fault, that she was intoxicated and skiing out of control. As to this statement, Hiibschman's mother later submitted an affidavit denying she had said it.

16. Skiing beyond one's ability, AS 09.65.-135(c)(1)(G), would constitute an unreasonable assumption of a negligently created risk.

17. Alaska Statute 09.17.060 reads as follows:

**Effect of contributory fault.** In an action based on fault seeking to recover damages for injury or death to a person or harm to property, contributory fault chargeable to the claimant diminishes proportionately the amount awarded as compensatory damages for the injury attributable to the claimant's contributory fault, but does not bar recovery.

As such, we must interpret the Ski Act so as not to nullify the comparative negligence statute. The reason for this was explained in *Rini v. Oaklawn Jockey Club*, 861 F.2d 502, 508 (8th Cir.1988):

> "[W]here assumption of risk coincides with contributory negligence, application of the doctrine operates to frustrate the very result that the comparative negligence statute was designed to achieve." *Rutter v. Northeastern Beaver County School District*, 437 A.2d at 1210 n. 6 (plurality). Dean Prosser also noted that the retention of this form of assumption of risk after legislative adoption of comparative negligence
>
> > [i]n all probability ... defeats the basic intention of the statute, since it continues an absolute bar in the case of one important, and very common, type of negligent conduct on the part of the plaintiff. It can scarcely be supposed in reason that the legislature has intended to allow a partial recovery to the plaintiff who has been so negligent as not to discover his [or her] peril at all, and deny it to one who has at least exercised proper care in that respect, but has made a mistake of judgment in proceeding to encounter the danger after it is known.
>
> W. Prosser, Prosser on Torts § 68, at 457 (4th ed. 1971) (footnote omitted).

We note that this approach has been adopted by Oregon. *Jessup v. Mt. Bachelor, Inc.*, 101 Or.App. 670, 792 P.2d 1232, 1233 *rev. denied* 310 Or. 475, 799 P.2d 646 (1990). The Oregon Court of Appeals held that while recovery is barred for an injury caused solely by an inherent risk of skiing, comparative fault applies when the injury is caused by a combination of an inherent risk of skiing and the ski area operator's negligence. *Id.*

The City disagrees with this approach, placing emphasis on a Utah statute similar to Alaska's Ski Act. The City cites *From Wright to Sunday and Beyond: Is the Law Keeping Up With the Skiers?* 4 Utah L.Rev. 885, 893–97 (1985):

> By extending immunity to ski resorts when an "inherent risk" causes the injury, the Utah legislature has pre-empted the comparative negligence statute for those risks. Thus, where an injury results from a hazard categorized as an "inherent risk," the skier injured in Utah is contributorily negligent per se, despite the comparative negligence statute.

Two critical facts, however, differentiate Utah's statute from the Alaska Ski Act. First, the Alaska statute omits language contained in the Utah statute: "[n]otwithstanding anything in Sections 78–27–37 through 78–27–43 [78–27–38 is the specific provision adopting comparative negligence] to the contrary, no skier may make any claim against, or recover from, any ski area operator for injury resulting from any of the inherent risks of skiing." Utah Code Ann. 78–27–53 (1953). Second, Alaska's comparative negligence statute was passed *after* the Ski Act, whereas in Utah it was passed before the ski statute. The statutory enactment of comparative negligence in Alaska after the inherent risk of skiing statute, without acknowledging the Ski Act, indicates a legislative intent to allow principles of comparative negligence into the ski context. *Cf. In re Tapp*, 16 B.R. 315 (Bankr.Alaska 1981).

Moreover, because Alaska had comparative negligence as a matter of case law as early as 1975, *e.g. Kaatz v. State*, 540 P.2d 1037, 1049 (Alaska 1975), the Ski Act's failure to specifically eliminate comparative negligence in the ski context, as Utah did, indicates that the legislature did not intend to exclude comparative negligence analysis. Our conclusion is reinforced by the statute's legislative history, which indicates that the statute was not intended to eliminate ski area operator's liability for negligence.

On remand, questions of whether Hibschman's actions were reasonable, including the relevance of her drinking and her knowledge of the risk of taking the jump, will be relevant to the issue of comparative negligence.

## IV. WERE THE POSTED SIGNS INSUFFICIENT AS A MATTER OF LAW TO SATISFY AS 09.65.135?

The superior court found that a genuine issue of material fact existed as to

whether the signs were posted at prominent locations in the ski area. Hiibschman contends that the posted signs were insufficient as a matter of law, for they were not "trail signs" nor were they posted at "prominent locations" as required by statute.

We find Hiibschman's arguments without merit. The superior court left for the jury the general issue of the adequacy of notice and signing. The issues of "the size, content, number, location, and prominence of the signs" were all tried by the jury, and the evidence in the record supports the verdict. Steven Weber, who was the Director of the Parks and Recreation Department in Valdez at the relevant time, explained that he had posted the signs so that "the average skier—or the skier participating in the activity could stop and read the sign." It was typed in bold letters with some underlining. While there were no inherent risk of skiing signs on the hill itself, Weber stated:

> [W]e felt ... the best place to do that was at the bottom of the hill where most of the activity took place, where ... the skiers had to initially go by to get to the ski lift. Posting signs throughout the hill ... didn't really meet that requirement in my eyes. I felt that the intent or the spirit of this statute here was to inform the skiers, and I felt the best way to inform them was prior to skiing and not after skiing. And, skiers would traditionally normally use the restroom prior to skiing, use the warm-up hut prior to skiing to put their boots on and then ... by the nature of the way they travelled to the ski lift ... we had a couple of

signs posted there they would have to go by in order to get to the ski lift and actually load on the lift.

Although no "trail" signs were posted, Salmonberry Ridge is just one small open hill; there are no real, designated trails as such. After skiers get off of the lift, they have the option of going to the right or going to the left, skiing each respective side of the hill. While others, including Hiibschman, said that they saw no signs, the jury found that such signs were posted. John Wiland, the mountain manager when Salmonberry Ridge opened, testified that signs were posted in each of the outhouses, going into the warming hut, on the lift shack, and at the top of the lift shack. Theresa Day was skiing on the day of Hiibschman's injury and recalls seeing signs posted in the outhouse and in the ski tow area. Aaron Kelly, who also was skiing with Hiibschman, saw the signs posted on the inside of the outhouse and on the front of the warming hut. Therefore, we affirm the superior court's ruling that genuine issues of material fact existed as to whether requisite signs were posted at prominent locations in the ski area.[18]

## V. DID THE SUPERIOR COURT ABUSE ITS DISCRETION IN GRANTING THE PROTECTIVE ORDER RELATING TO HIIBSCHMAN'S PRIOR DWI CONVICTION AND/OR PRIOR DRINKING EXPERIENCE?

The superior court prohibited the City from discovering or using evidence relating to Hiibschman's prior Driving While Intoxicated (DWI) conviction and prior drinking experience pursuant to Evidence Rule 402 [19] and 403.[20]

We reverse a trial court's decision on the admission of evidence only for an

---

**18.** Our resolution of the merits of this issue makes it unnecessary to discuss the City's argument that the issue is improperly before the court.

**19.** Evidence rule 402 states,
All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or of this state, by enactments of the Alaska Legislature, by these rules, or by other rules adopted by the Alaska Supreme

Court. Evidence which is not relevant is not admissible.

**20.** Evidence Rule 403 states,
Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

abuse of discretion. *Adkinson v. State*, 611 P.2d 528, 532 (Alaska), *cert. denied* 449 U.S. 876, 101 S.Ct. 219, 66 L.Ed.2d 97 (1980). The City believes that such an abuse occurred; it argues that the probative value of the evidence far exceeds its prejudicial effect. The City intends to use the evidence to establish that Hiibschman and her mother knew of the adverse effects the alcohol had on Hiibschman's functioning. The City claims the evidence shows Hiibschman's lack of judgment on the day of the accident, as well as her mother's own negligence in permitting Hiibschman to drink alcohol. It also shows Hiibschman's tolerance level for alcohol.[21]

We hold that the superior court did not abuse its discretion in issuing the protective order. While the City argues that the court's citation to Rules 402 and 403 indicates that the court found "the evidence relevant under 402, but nonetheless excluded it under Rule 403 . . . .", the sparse reference by the superior court does not conclusively support the City's interpretation. The court also may have found the evidence irrelevant under Evidence Rule 402.

We conclude that the evidence does have marginal relevance. Hiibschman admits knowledge about the effects of alcohol. She has taken Freshman Health in school where she learned about the amount of alcohol that impairs one's judgment. While Hiibschman claims she did not drink enough to impair her judgment, the excluded evidence is only slightly relevant to this point. In *Dyer v. State*, the court of appeals said that evidence used to impeach a witness by showing that he was an alcoholic at the time of the incident about which he was testifying "was only tangentially probative of how much alcohol he actually drank that particular night." 666 P.2d 438, 451 (Alaska App.1983). Moreover, other evidence exists which suggests Hiibschman's consumption and impairment. The availability of alternative evidence goes to the probativeness of the evidence in dispute. Finally, this information is not relevant to the comparative negligence of Hiibschman's mother, for she did not give Hiibschman alcohol on the day in question.

The cases cited by the City are unhelpful. This type of relevance question, requiring the balancing of prejudice and probativeness, is a fact specific inquiry. The potential prejudice, that the jury would punish Hiibschman for her prior conduct, may outweigh the evidence's marginal relevance. The superior court did not abuse its discretion.[22]

CONCLUSION

We AFFIRM in part, and REVERSE in part, and REMAND the case for a new trial.

---

21. Hiibschman was arrested in December 1985 for DWI. She entered a plea of no contest, receiving a sentence of a $250 fine, 72 hours in jail, and alcohol screening. She claimed that the experience made her very careful about drinking. The incident involved drinking some of her grandfather's beer and putting her mother's truck into a ditch. She alleges the truck ended up in the ditch not because of her alcohol consumption, but because the street had about four inches of glare ice on it. When she touched the brakes to stop at the stop sign, the truck slid into the ditch. She recognizes that her judgment was impaired.

22. As to the other issues on appeal, we need not address them. The City concedes that expert testimony is not essential if the matter is remanded. As to Hiibschman's argument that AS 09.65.135 violates equal protection under the Alaska Constitution, our construction of AS 09.65.135 makes resolution of this issue unnecessary.